# In the
# United States Court of Appeals
## For the Seventh Circuit

———————

No. 03-3305

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

MARK K. VINCENT,

*Defendant-Appellant.*

———————

Appeal from the United States District Court
for the Central District of Illinois.
No. 02 CR 30042—**Richard Mills**, *Judge.*

———————

ARGUED FEBRUARY 24, 2005—DECIDED JULY 25, 2005

———————

Before FLAUM, *Chief Judge*, and MANION and EVANS, *Circuit Judges*.

FLAUM, *Chief Judge*.  A jury convicted defendant Mark Vincent of four counts of wire fraud, 18 U.S.C. § 1343, two counts of mail fraud, § 1341, and two counts of making a false statement to obtain and extend a loan, § 1014. Vincent appeals, arguing that the district court erred in denying his motions to continue the trial and dismiss the indictment. Defendant also contends that his sentence violates his Sixth Amendment rights as interpreted by *United States v.*

*Booker*, 125 S. Ct. 738 (2005). For the reasons stated herein, we affirm Vincent's convictions. While retaining jurisdiction, we remand for proceedings consistent with our opinion in *United States v. Paladino*, 401 F.3d 471 (7th Cir. 2005).

## I. Background

In 1992, Mark Vincent received a law degree, passed the bar examination, and began practicing law in Illinois. Later that year, he became a member of the Attorneys' Title Guarantee Fund, Inc. ("ATGF"). ATGF provides title insurance through its network of member lawyers. As a member of ATGF, Vincent began a title insurance business which required him to act as a financial intermediary in real estate closings. Vincent's clients involved in those transactions entrusted to him funds specifically designated for the purchase of real property. Vincent deposited these funds into client trust accounts.

In 1998, ATGF noticed that Vincent had been slow in disbursing funds from the trust accounts to pay for approved real properties. This triggered an investigation into Vincent's handling of clients' funds, first by ATGF and later by federal law enforcement authorities. On May 3, 2002, the grand jury for the Central District of Illinois indicted Vincent for mail fraud, wire fraud, and making false statements to obtain and extend a loan. The indictment charged that Vincent had used his clients' funds not to purchase real estate on their behalf, but instead to pay his business expenses and to buy himself a car, jewelry, and other luxury items. It asserted that when the funds began to run out, Vincent applied for a loan from a federally insured bank to cover the shortfall. As alleged, Vincent induced the bank to authorize the loan, and later to extend the repayment schedule, by lying about why he needed the money.

Vincent elected to represent himself during discovery and at trial. The district court initially scheduled trial to begin on July 2, 2002. On June 17, 2002, Vincent moved for a continuance, asserting that the case was complex and document-intensive. Moreover, he alleged that he was suffering from partial blindness in one eye that impaired his ability to read for comprehension. Defendant stated that he would undergo surgery on July 16, 2002 to correct the problem. The district court granted the motion, which was unopposed, and moved the trial to November 5, 2002.

On October 7, 2002, Vincent moved to postpone the trial a second time, reiterating many of the same reasons stated in his first motion. Defendant added that the government had failed to supply him with real estate closing files, the government's expert report, or back-up tapes from computers in his office. Vincent asserted, moreover, that he had taken longer than expected to recuperate from his eye surgery. Attached to the motion was an affidavit from Vincent's optometrist estimating that he likely would have had difficulty reading for comprehension until September 20, 2002. Defendant sought an additional 60 days to prepare for trial.

The government opposed a second continuance. It pointed out that it had made available for inspection all paper discovery in its possession, including the real estate closing files, since May 15, 2002. Vincent had chosen not to review the documents. Moreover, although the government had yet to disclose its expert report, it had given Vincent the name of the expert, whose report would draw solely from the paper discovery already available to Vincent. The government had not turned over the back-up tapes, but only because they were in an unreadable format. It promised to provide Vincent a copy of the data once it was converted to a usable format.

The district court denied the second motion to continue. Nevertheless, for reasons that are not clear from the record, the court later postponed the trial until December 2, 2002.

A few weeks after seeking the second continuance, Vincent moved to dismiss the indictment, arguing that the government had presented evidence to the grand jurors that it knew to be false. According to the motion, the government put forth false evidence that: (i) Judith Simpson, one of the victims of the fraud scheme, had not recovered any of the money she entrusted to Vincent; (ii) defendant had violated the Illinois Rules of Professional Responsibility by moving funds from client trust accounts to a general business account; and (iii) ATGF had conducted a "partial audit" of Vincent's accounts.

The district court denied the motion to dismiss. It found that Vincent had not shown that the government knew that the evidence was false. It concluded, moreover, that the evidence was not material to the charged offenses.

The case went to trial on December 2, 2002. The government presented evidence of the scheme as charged in the indictment. That evidence included testimony from Tony Osinga, an ATGF employee, that he had asked Vincent to turn over a copy of defendant's bank statements regarding the trust accounts. Osinga received an obviously forged bank statement faxed from Vincent's office and accompanied by notes in Vincent's handwriting. Peter Birnbaum, another ATGF employee, testified that Vincent had confessed during a telephone conversation to taking clients' funds. The government also introduced a message sent from Vincent's email account to Birnbaum recounting the conversation and the admission of wrongdoing.

Vincent took the stand and testified in his own defense. During cross-examination he agreed that the bank statement sent to Osinga was a forgery, but denied making the bank statement or faxing it to Osinga. He also denied confessing to Birnbaum or sending the incriminating email. The jury convicted Vincent on all counts presented to it:

four counts of wire fraud, two counts of mail fraud, and two counts of making a false statement to obtain or extend a loan.[1]

The district court sentenced Vincent on August 18, 2003. Applying our pre-*Booker* jurisprudence, the court increased defendant's offense level based on the amount of the loss, *see* United States Sentencing Guidelines ("U.S.S.G.") § 2F1.1(b)(1)(K) (1998), and because the crimes involved more than minimal planning, *see* § 2F1.1(b)(2)(A), and abuse of a position of trust, *see* § 3B1.3. It also found that Vincent had perjured himself at trial and enhanced Vincent's offense level for obstruction of justice. *See* § 3C1.1. Each of these enhancements relied on facts found by the judge, not the jury. The court imposed a sentence of 46 months of imprisonment—the middle of the resulting guideline range—to run concurrently on each count. Vincent appeals.

## II.  Discussion

On appeal, Vincent seeks to overturn his convictions by challenging the district court's denial of his second motion to continue the trial and its denial of his motion to dismiss the indictment. Vincent also attacks his sentence. We address each issue in turn.

## A.  Second Motion to Continue

Vincent contends that the district court erred by denying his second motion to continue the trial. Defendant also

---

[1]  Prior to trial and on the government's motion, the district court dismissed two additional counts charged in the indictment. Those counts were not presented to the jury and are not at issue on appeal.

argues that the denial so hampered his ability to represent himself effectively that it violated his Sixth Amendment rights. District courts should consider the following non-exhaustive list of factors when ruling on a motion to continue:

> 1) the amount of time available for preparation; 2) the likelihood of prejudice from denial of the continuance; 3) the defendant's role in shortening the effective preparation time; 4) the degree of complexity of the case; 5) the availability of discovery from the prosecution; 6) the likelihood a continuance would have satisfied the movant's needs; and 7) the inconvenience and burden to the district court and its pending case load.

*United States v. Miller*, 327 F.3d 598, 601 (7th Cir. 2003). The district court is best able to judge the relative weight of these factors, and we will not reverse the denial of a continuance absent an abuse of discretion and a showing of actual prejudice to the defendant. *Id.*; *United States v. Farr*, 297 F.3d 651, 655 (7th Cir. 2002). As for defendant's Sixth Amendment challenge, "[o]nly an unreasoning and arbitrary 'insistence upon expeditiousness in the face of a justifiable request for delay' violates the right to the assistance of counsel." *Morris v. Slappy*, 461 U.S. 1, 11-12 (1983) (quoting *Ungar v. Sarafite*, 376 U.S. 575, 589 (1964)).

The district court acted well within its discretion in denying the second motion to continue. Vincent had sufficient time to prepare for trial. Accepting defendant's assertions at face value, his vision would have been restored fully by September 20, 2002, more than seventy days before trial. These seventy days exclude all of the time from May 15th, when the government made most of the discovery available to Vincent, through September 20th. During that span, Vincent could prepare for trial in ways that did not require close visual acuity. Indeed, defendant took advantage of that time by interviewing witnesses.

Furthermore, Vincent has not shown that he suffered any prejudice from the denial. Defendant asserts that he needed more time to examine the paper discovery and to prepare his cross-examination of the government's witnesses. Despite ample time since trial, however, Vincent has neither pointed to exculpatory evidence he would have found in the discovery nor proposed additional questions he would have asked the government's witnesses. *See United States v. Robbins*, 197 F.3d 829, 846 (7th Cir. 1999) (affirming denial of motion to continue where the defendants "did not identify any specific material prejudice they suffered" from the denial). Even if Vincent was rushed, his lack of diligence contributed to the problem by shortening the time to prepare. Defendant chose not to review the documents in the government's possession until after he filed his second motion to continue on October 7, 2002. While his eye condition made it difficult to read, Vincent does not allege that the condition prevented him from reading altogether. And Vincent's health does not explain why he chose not to examine the government's files until at least two and one-half weeks after his vision had been fully restored.

Vincent relies heavily on the complexity of the case to support his argument that the district court should have continued the trial. The case was somewhat complex, but Vincent's business generated most of the documents at issue. Defendant therefore was familiar with much of the evidence from the outset. Moreover, the government made discovery available promptly, and actively cooperated with Vincent's efforts to prepare for trial. The government opened its files on May 15, 2002, soon after the grand jury indicted defendant. The government did not hand over the back-up tapes until October 2002, but only because those tapes were in an unreadable format. Nothing in the record suggests that the government failed to act diligently to resolve this problem. And once it had reformatted the data, the government passed the discovery along to Vincent.

When Vincent ran into trouble using the software that reads the data, the prosecution set up a government computer, complete with independent support staff, to assist him. Vincent never took advantage of these resources. On this record, the district court did not abuse its discretion in denying the second motion to continue.

Likewise, Vincent's Sixth Amendment challenge to the denial of the continuance fails. In denying the motion, the district court considered the amount of time to prepare, defendant's failure to examine the available discovery, and his familiarity with the facts. We cannot say that the court's decision was "an unreasoning and arbitrary 'insistence upon expeditiousness in the face of a justifiable request for delay.'" *Slappy*, 461 U.S. at 11-12 (quoting *Ungar*, 376 U.S. at 589).

## B. Motion to Dismiss the Indictment

Next, Vincent argues that the district court erred by refusing to dismiss the indictment. Defendant asserts that dismissal was required because the government secured his indictment by presenting evidence to the grand jury that the prosecution knew to be false. Vincent offers three excerpts from the grand jury proceedings to support this charge. First, FBI Agent Price McCarty testified before the grand jury that one of the victims of Vincent's alleged scheme, Judith Simpson, never recovered any of the approximately $140,000 she had entrusted to defendant. Vincent points out, however, that Simpson eventually recouped about $20,000 through bankruptcy proceedings.

Second, the Assistant United States Attorney ("AUSA") handling the case represented that the Illinois Rules of Professional Conduct required Vincent to keep funds entrusted by a client in an account separate from that used to pay personal or business expenses. The AUSA then elicited testimony from Agent McCarty that Vincent violated these rules by diverting funds from client trust accounts to his

general checking account. While Vincent does not dispute that he commingled funds, he asserts that rules issued by the Illinois Office of Banks and Real Estate ("OBRE Rules"),[2] not the Rules of Professional Conduct, govern his management of the trust accounts.

Third, Agent McCarty testified that an accountant hired by ATGF had conducted a "partial audit" of Vincent's client trust accounts. Defendant asserts that this was not true because the accountant merely "reviewed check activity."

Assuming solely for the purposes of argument that the government presented evidence that it knew to be inaccurate, the district court could dismiss the indictment "only if it is established that the violation substantially influenced the grand jury's decision to indict, or if there is grave doubt that the decision to indict was free from the substantial influence of such violations." *United States v. Brooks*, 125 F.3d 484, 497 (7th Cir. 1997) (quoting *Bank of Nova Scotia v. United States*, 487 U.S. 250, 256 (1988)) (internal quotations omitted); *see also United States v. Geisler*, 143 F.3d 1070, 1072 (7th Cir. 1998). In other words, "[a] district court may not dismiss an indictment for errors in grand jury proceedings unless such errors prejudiced the defendants." *Brooks*, 125 F.3d at 497 (quoting *United States v. Mechanik*, 475 U.S. 66, 78 (1986)).

Defendant's challenge fails because he has not shown that any of the alleged discrepancies would have mattered to the grand jury. First, Simpson's partial recovery in bankruptcy

---

[2] Both parties refer to these rules as having been issued by the Illinois Department of Professional Regulation. On July 3, 1996, however, the General Assembly transferred the power to issue these rules to the Office of Banks and Real Estate. 20 Ill. Comp. Stat. 3205/9.2. Any rules then in effect became those of the Office of Banks and Real Estate. *Id.* 3205/9.5. Accordingly, we refer to them as the OBRE Rules.

has little to no relevance to the mail or wire fraud charges, the only counts connected to Vincent's handling of Simpson's funds. To secure an indictment for mail or wire fraud, the government was required to show probable cause to believe that the defendant: (i) participated in a scheme to defraud; (ii) acted with intent to defraud; and (iii) used the mail or wires in furtherance of the fraudulent scheme. *United States v. Tadros*, 310 F.3d 999, 1006 (7th Cir. 2002). The government was not obligated to prove that Simpson lost all, or even a portion, of the entrusted money. *United States v. Dick*, 744 F.2d 546, 550 (7th Cir. 1984) (proof of pecuniary loss is not an element of mail fraud); *United States v. Ashman*, 979 F.2d 469, 478 (7th Cir. 1992) (same for wire fraud). Nor is it a defense to either charge that the accused voluntarily returned the funds. *See United States v. Gross*, 416 F.2d 1205, 1209 (8th Cir. 1969) (repayment not a defense to mail or wire fraud); *United States v. Sun-Diamond Growers of Cal.*, 138 F.3d 961, 972 (D.C. Cir. 1998) (same for wire fraud). *Cf. United States v. Sylvanus*, 192 F.2d 96, 105 (7th Cir. 1951) (rejecting defendants' argument that their offer to refund money negated convictions for mail fraud). While a partial recovery might be relevant to a defendant's intent to defraud, Simpson's recovery does not advance the theory that Vincent made an honest mistake. As of trial, Vincent had failed to repay over $120,000 of the money entrusted to him by Simpson. The limited amount that Simpson had recovered was not obtained voluntarily from defendant, but rather from the trustee administering Vincent's bankrupt estate, and only upon the order of the bankruptcy court. We find it implausible that the grand jury would have refused to indict had they known of Simpson's partial recovery and its circumstances. *Cf. United States v. White*, 553 F.2d 1137, 1138 (8th Cir. 1977) (doubting relevance, in a mail and wire fraud case, of repayment to victim by a third party after defendant filed for bankruptcy).

Second, Vincent was not prejudiced by the representation that the Rules of Professional Conduct, instead of the OBRE Rules, govern his handling of client funds. Vincent makes no attempt to explain why the OBRE Rules displace his obligations as an attorney under the Rules of Professional Conduct, and therefore has not established that this representation was incorrect, much less knowingly false. Moreover, both sets of rules demand that funds entrusted by a client be maintained in a separate account. *See* Ill. Rules Prof'l Conduct 1.15(a); Ill. Admin. Code tit. 68, § 1450.40(b)(1) (1999). Even if the AUSA's representation was false, the larger point remains true—that Vincent violated an ethical rule by moving clients' funds into his business account. The probative value of this evidence does not depend upon which rule Vincent violated. The possible misstatement about which rule governs, therefore, did not prejudice defendant.

Third, referring to ATGF's investigation as a "partial audit" instead of a "review of check activity" did not substantially influence the grand jury's decision to indict in this case. We do not see a meaningful difference between these terms, and Vincent has not presented any evidence to suggest that the two labels confer different senses.

Even if errors in the grand jury proceedings would have justified the district court in dismissing the indictment prior to trial, the petit jury's subsequent conviction of Vincent rendered these errors harmless beyond a reasonable doubt. *See Mechanik*, 475 U.S. at 70. The defendants in *Mechanik* had been convicted at trial of drug and conspiracy offenses. They sought to dismiss their indictment and overturn their convictions, alleging that the government had violated Federal Rule of Criminal Procedure 6(d) by allowing two witnesses to testify before the grand jury at the same time. The Supreme Court assumed that the joint testimony violated Rule 6(d) and that the district court would have been warranted in dismissing the indictment before trial.

The Court held, nevertheless, that the convictions should stand. It reasoned that Rule 6(d) "protects against the danger that a defendant will be required to defend against a charge for which there is no probable cause to believe him guilty." *Id.* It continued:

> But the petit jury's subsequent guilty verdict means not only that there was probable cause to believe that the defendants were guilty as charged, but also that they are in fact guilty as charged beyond a reasonable doubt. Measured by the petit jury's verdict, then, any error in the grand jury proceeding connected with the charging decision was harmless beyond a reasonable doubt.

*Id.*

Although *Mechanik* addressed a violation of Rule 6(d), we have extended its analysis "to rules that are designed to prevent the indictment of innocent persons." *United States v. Fountain*, 840 F.2d 509, 515 (7th Cir. 1988). The rule against perjured testimony at grand jury proceedings qualifies as this type of rule. *See United States v. Morgan*, 384 F.3d 439, 443 (7th Cir. 2004) (petit jury's conviction rendered harmless any error from alleged perjury during grand jury proceedings).

Vincent argues, nevertheless, that our opinion in *United States v. Udziela*, 671 F.2d 995 (7th Cir. 1982), requires reversal. *Udziela* drew on its supervisory power to hold that:

> where perjured testimony supporting an indictment is discovered before trial the government has the option of either voluntarily withdrawing the tainted indictment and seeking a new one before the grand jury when it reconvenes, unless it is already sitting, or of appearing with defense counsel before the district court for an in camera inspection of the grand jury transcripts for a determination whether other, sufficient evidence exists to support the indictment. If other, sufficient evidence

> is present so that the grand jury may have indicted without giving any weight to the perjured testimony, the indictment cannot be challenged on the basis of the perjury.

*Id.* at 1001. Defendant asserts that *Udziela* required the government either to submit the entire grand jury transcripts to the district court or to seek a new indictment. Because it did neither, Vincent contends that we must reverse his convictions.

We disagree. To the extent that *Udziela* mandates the dismissal of an indictment without a showing of prejudice, it does not survive *Bank of Nova Scotia*. 487 U.S. at 254 (holding that a district court may not invoke its supervisory power to dismiss an indictment because of non-constitutional errors in grand jury proceedings unless the errors prejudiced the defendants); *see also Geisler*, 143 F.3d at 1072 (applying *Bank of Nova Scotia* to a claim of perjured grand jury testimony); *Brooks*, 125 F.3d at 497 (same). And even if the district court would have been warranted under *Udziela* in dismissing the indictment before trial, we have no authority to reverse its refusal to do so given the petit jury's conviction. *See Mechanik*, 475 U.S. at 70. In sum, Vincent has not shown that the allegedly inaccurate evidence influenced the grand jury's decision to indict, or that he was forced to defend a charge for which there was not reasonable cause to believe him guilty. Because he was not prejudiced by the alleged errors, his challenge to the indictment fails.

## C. *Booker*

Finally, Vincent contends that the district court violated his Sixth Amendment rights by enhancing his sentence based on facts not found by a jury. Because Vincent did not raise a Sixth Amendment or related challenge to his sen-

tence before the district court, we review for plain error. *United States v. Baker*, 406 F.3d 911, 913 (7th Cir. 2005).

> [B]efore an appellate court can correct an error not raised at trial, there must be (1) error, (2) that is plain, and (3) that affect[s] substantial rights. If all three conditions are met, an appellate court may then exercise its discretion to notice a forfeited error, but only if (4) the error seriously affect[s] the fairness, integrity, or public reputation of judicial proceedings.

*Id.* (quoting *Johnson v. United States*, 520 U.S. 461, 466-67 (1997)) (internal quotations omitted).

"Deviation from a legal rule is 'error' unless the rule has been waived." *United States v. Olano*, 507 U.S. 725, 732-33 (1993). *Booker* states the governing legal rule: "[a]ny fact (other than a prior conviction) which is necessary to support a sentence exceeding the maximum authorized by the facts established by a plea of guilty or a jury verdict must be admitted by the defendant or proved to a jury beyond a reasonable doubt." 125 S. Ct. at 756. The district court deviated from this rule, and therefore erred, by enhancing Vincent's sentence above that authorized by the jury's verdict alone.

An error is "plain" if it is clear or obvious. *Olano*, 507 U.S. at 734. Although the district court's practice complied with then-prevailing Circuit law, *Booker* now makes that error obvious. *See Johnson*, 520 U.S. at 468 ("it is enough that an error be 'plain' at the time of appellate consideration.") Defendant therefore has satisfied the first two prongs of the plain error test.

While the government concedes these points, it argues that Vincent can show neither that the error affects substantial rights nor that it affects the fairness, integrity, or public reputation of judicial proceedings. In most cases, an error affects substantial rights only if it is prejudicial: "[i]t must have affected the outcome of the district court pro-

ceedings." *Olano*, 507 U.S. at 734. *Booker*'s remedial holding permits the district courts to continue to make findings of fact, but directs them to apply the sentencing guidelines as advisory only. 125 S. Ct. at 764-65. Thus, Vincent was prejudiced, if at all, by the district court's application of the guidelines as mandatory. Whether the third prong is satisfied here therefore turns on whether the district court would have imposed a lower sentence had it considered the guidelines as advisory.

As for the fourth prong, an error that causes a "miscarriage of justice" seriously affects the fairness, integrity and public reputation of judicial proceedings. *United States v. Stewart*, ___ F.3d ___, ___, 2005 WL 1389434, *4 (7th Cir. June 14, 2005); *Paladino*, 401 F.3d at 481. "[I]f the defendant has been prejudiced by an illegal sentence, then allowing that illegal sentence to stand would constitute a miscarriage of justice." *United States v. White*, 406 F.3d 827, 836 (7th Cir. 2005) (quoting *United States v. Macedo*, 406 F.3d 778, 790 (7th Cir. 2005)). This inquiry also hinges on what the district court would have done with the benefit of additional discretion. We cannot answer this question on the current record. Accordingly, while retaining jurisdiction, we remand to the district court to conduct the limited inquiry described in *Paladino*.

### III. Conclusion

For the reasons stated herein, we AFFIRM Vincent's convictions. While retaining jurisdiction, we REMAND to the district court for the limited inquiry outlined in *Paladino*.

A true Copy:

    Teste:

                  _____
                  ***Clerk of the United States Court of Appeals for the Seventh Circuit***