In the

# United States Court of Appeals

## For the Seventh Circuit

No. 07-3726

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

ROHAN G. HERON,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Southern District of Illinois.
No. 06-30068-WDS—**William D. Stiehl**, *Judge.*

ARGUED OCTOBER 31, 2008—DECIDED MAY 5, 2009

Before FLAUM, ROVNER, and WOOD, *Circuit Judges.*

WOOD, *Circuit Judge.* In May of 2006, Rohan Heron decided to ride shotgun with his friend Gigiman Hamilton on a cross-country road trip. It is unclear whether Heron initially knew that this trip was for the purpose of trafficking drugs. A confidential informant did know, however, and tipped off the Drug Enforcement Administration ("DEA"). The DEA, in turn, let the Caseyville Police Department know that a semi-tractor trailer carrying a shipment of marijuana and possibly

cocaine would be arriving in St. Clair County, Illinois. Based on this information, Officer Greg Hosp stopped Hamilton's vehicle. After a dog alerted to the presence of drugs, Hosp and the K-9 unit officer searched the truck, discovered marijuana and cocaine, and arrested Hamilton and Heron.

Heron was charged with possession with the intent to distribute five or more kilograms of cocaine and possession with intent to distribute 100 or more kilograms of marijuana, both in violation of 21 U.S.C. § 841(a)(1). He was convicted and sentenced to 120 months' imprisonment. Before trial, he filed a motion to suppress statements he had made, but his motion was denied in part. During trial, he made a motion for a continuance, which was also denied. He now appeals, asserting that the court's denial of his motion for a continuance was both an abuse of discretion and a violation of his constitutional rights to due process and effective assistance of counsel. We agree with Heron that it was an abuse of discretion to deny the motion for a continuance. We therefore reverse and remand for further proceedings.

**I**

Hosp stopped Hamilton's vehicle at 1:30 a.m. on May 10, 2006, and Hamilton's and Heron's arrests followed shortly thereafter. Hamilton was given *Miranda* warnings and interrogated the next day. According to the DEA-6 Report of Investigation for this interview, Hamilton stated that he had asked "his friend, Rohan HERON, to drive with him to California in order to help him drive

back." Hamilton did not allude to any other trips the two might have taken. On November 13, 2006, Hamilton gave an additional statement, with counsel present, which was memorialized in another DEA-6 Report. At this meeting, Hamilton stated that Heron "was only involved in the transportation of marihuana on the occasion in which they were arrested in Illinois" and that "at first, HERON did not want to participate in the transportation." Hamilton added, however, that Heron "agreed to assist in the transportation of the marihuana for $20,000," which was half of the payment for the entire shipment.

On June 11, 2007, the day before Heron's trial, Hamilton changed his story. He informed the government that he now intended to testify that Heron had been involved in two prior drug trips as well. At 6:00 that evening—that is, as soon as it could—the government informed defense counsel of this change in testimony. The next morning, defense counsel made an oral motion "to compel the government to generate a DEA-6," or, in the alternative, to "compel Mr. Hamilton to discuss with me the testimony that he has already discussed with the government." The court ordered the government to make Hamilton available but refused to compel him to speak to defense counsel. Defense counsel then moved for a continuance to investigate the new testimony. The government did not oppose the motion, but the district court denied it, commenting only that it was 9:30 in the morning of trial and that despite the court's sympathy "to the immediacy of the events that prompted your Motion at this time," the trial would not be continued. The court offered no further explanation of its ruling.

Heron had been interrogated on May 10 at 4 a.m. by Special Agent Scott and Task Force Officer Wade Gummersheimer. The government says that this meeting was conducted at Heron's request and that someone at the Fairview Heights Police Department conveyed the request to Gummersheimer. Heron asserts that there is insufficient evidence in the record to support that contention, as Gummersheimer did not testify at the suppression hearing, and the person who allegedly made the phone call was never identified. The critical point, however, is undisputed: Heron was not given *Miranda* warnings at this interview. The DEA-6 Report for this meeting notes that Heron maintained that it was only in Phoenix, Arizona, that he became aware that he and Hamilton were driving bags full of marijuana across the country. Thirty-two hours later on May 11, Scott and Special Agent Rehg began another interrogation of Heron at the Fairview Heights Police Department, except this time they did administer *Miranda* warnings. During the second session, Heron said essentially the same thing as he had at the May 10 session.

Heron filed a motion to suppress his statements from both the May 10 and May 11 interrogations. The district court ruled that the May 10 statements had to be suppressed, but that the May 11 statements could be admitted.

## II

We begin with Heron's assertion that the district court erred when it refused to grant a continuance after Hamilton changed his testimony at the eleventh hour. Heron

argues that the court's refusal to do so was both an abuse of discretion and a constitutional violation. We need not reach the constitutional argument unless we conclude that the district court did not abuse its discretion (the relevant standard of review) when it acted. *United States v. Vincent*, 416 F.3d 593, 598 (7th Cir. 2005). This court has identified several factors that a district court should consider in deciding whether to grant such a motion:

> 1) the amount of time available for preparation; 2) the likelihood of prejudice from denial of the continuance; 3) the defendant's role in shortening the effective preparation time; 4) the degree of complexity of the case; 5) the availability of discovery from the prosecution; 6) the likelihood a continuance would have satisfied the movant's needs; and 7) the inconvenience and burden to the district court and its pending case load.

*Id.* In Heron's case, most of these points weigh in favor of granting a continuance, some strongly so. Defense counsel had no time, as a practical matter, to prepare for the dramatic change in Hamilton's testimony, as he received notice only fifteen hours before the trial was to begin (Factor 1). While defense counsel was able to impeach Hamilton's revised story, the new account was more than enough to cast Heron in the jury's eyes as an active participant in the drug trip. Hamilton's previous statements had portrayed Heron as a reluctant participant who was coaxed into continuing the drug trip with offers of money. The change in testimony thus created a likelihood of prejudice (Factor 2). Heron did not play any

role in creating the time pressure (Factor 3). The presence of the new testimony added some complexity to the case, as the alleged previous trips would require further investigation (Factor 4). Finally, although defense counsel initially wondered whether Hamilton would testify with enough specificity about the timing of the trips to allow further investigation, Hamilton did in fact testify that the first prior trip was "[s]hortly after February" of 2006 and that the second prior trip was "[s]hortly after that. I think about a month or so." This narrowed the date range for the earlier trips and would have provided an adequate starting point for the investigation into trucking records, receipts, and cell phone records that Heron wished to conduct (Factor 6).

Only two factors weighed against granting a continuance. First, the government provided all information that was available to it immediately after Hamilton changed his testimony, even though it did not formally create a DEA-6 Report (Factor 5). In addition, delaying the trial may have been an inconvenience and a burden to the district court, even though the judge did not mention any special circumstances beyond the fact that the motion was being made at 9:30 a.m. on the morning of trial (Factor 7). While it is true that the court is entitled to adhere to the date it sets for trial, it "cannot have a myopic insistence upon expeditiousness in the face of a justifiable reason for delay." *United States v. Jones*, 455 F.3d 800, 804-05 (7th Cir. 2006) (internal quotation marks omitted).

Hamilton's changed testimony was a crucial piece of evidence that defense counsel should have had an oppor-

tunity to develop. We hold that the district court abused its discretion in denying the motion for a continuance.

### III

While our conclusion with respect to the continuance is enough to require a remand, we address Heron's suppression arguments as well, since this issue will inevitably arise again in the proceedings below. Heron argues that his May 11 statements should have been suppressed pursuant to *Miranda v. Arizona*, 384 U.S. 436 (1966) and *Missouri v. Seibert*, 542 U.S. 600 (2004). In reviewing a district court's ruling on a motion to suppress, this court reviews conclusions of law *de novo* and factual determinations for clear error. *United States v. Figueroa-Espana*, 511 F.3d 696, 701 (7th Cir. 2007).

Calling it a "close call," the district court suppressed the May 10 statements because "the officers should have given the defendant his *Miranda* warnings before engaging in a conversation with him." With regard to the May 11 statements, the court applied the test set forth in Justice Kennedy's concurring opinion in *Seibert*. This test requires that the court suppress statements that are a product of a "two-step interrogation technique [that is] used in a calculated way to undermine the *Miranda* warning." *Seibert*, 542 U.S. at 622. Importantly, "[t]he admissibility of postwarning statements should continue to be governed by the principles of [*Oregon v. Elstad*, 470 U.S. 298 (1985)] unless the deliberate two-step strategy was employed." *Id.* The district court found no intent on the

part of the DEA agents to engage in a two-step interroga-tion in an effort to evade the dictates of *Miranda*. It there-fore analyzed the interrogations under *Elstad* and found that the statements were given voluntarily after *Miranda* warnings had been administered.

No single opinion in *Seibert* spoke for the Court; we thus must strive to discern what exactly the decision requires. *Marks v. United States*, 430 U.S. 188, 193 (1977) provides the general rule for dealing with this kind of outcome: "When a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds" (internal quotation marks omitted). When, however, a concurrence that provides the fifth vote necessary to reach a majority does not provide a "common denomina-tor" for the judgment, the *Marks* rule does not help to resolve the ultimate question. See *Schindler v. Clerk of the Circuit Court*, 715 F.2d 341, 345 (7th Cir. 1983) (declining to apply the *Marks* rule to *Baldasar v. Illinois*, 446 U.S. 222 (1980)). See also *United States v. Carrizales-Toledo*, 454 F.3d 1142, 1150 (10th Cir. 2006) ("When the plurality and concurring opinions take distinct approaches, and there is no narrowest opinion representing the common denominator of the Court's reasoning, then *Marks* be-comes problematic. We do not apply *Marks* when the various opinions supporting the Court's decision are mutually exclusive.") (citations omitted) (internal quota-tion marks omitted); *A. T. Massey Coal Co. v. Massanari*, 305 F.3d 226, 237 (4th Cir. 2002) (because it found "no theoreti-

cal overlap between the rationales employed by the plurality and Justice Kennedy" in *Eastern Enterprises v. Apfel*, 524 U.S. 498 (1998), the court did not consider Justice Kennedy's reasoning to be a narrower ground or controlling); *King v. Palmer*, 950 F.2d 771, 781 (D.C. Cir. 1991) (*en banc*) ("But *Marks* is workable—one opinion can be meaningfully regarded as 'narrower' than another—only when one opinion is a logical subset of other, broader opinions. In essence, the narrowest opinion must represent a common denominator of the Court's reasoning; it must embody a position implicitly approved by at least five Justices who support the judgment.").

Applying that guidance, we conclude that the *Marks* rule is not applicable to *Seibert*. Although Justice Kennedy provided the crucial fifth vote for the majority, we find it a strain at best to view his concurrence taken as a whole as the narrowest ground on which a majority of the Court could agree. It is true that parts of his reasoning could be construed as a narrower ground than the one described in Justice Souter's plurality opinion, in that Justice Kennedy would carve out a smaller exception to *Elstad*. On the other hand, Justice Kennedy's intent-based test was rejected by both the plurality opinion and the dissent in *Seibert*. *Id.* at 611-12 ("The threshold issue when interrogators question first and warn later is thus whether it would be reasonable to find that in these circumstances the warnings could function effectively as *Miranda* requires.") (Souter, J., plurality opinion) (internal quotation marks omitted); *id.* at 624 ("The plurality's rejection of an intent-based test is also, in my view, cor-

rect.") (O'Connor, J., dissenting). Although it is hard to be sure, it is possible that Justice Breyer agreed with Justice Kennedy's focus on intent. *Id.* at 618 ("I also agree with Justice Kennedy's opinion insofar as it is consistent with [the fruits] approach and makes clear that a good-faith exception applies."). Counting Justice Breyer in the Kennedy camp, we are left with only two Justices who support the intent-based test. This is obviously not the "common denominator" that *Marks* was talking about.

In a situation like this, it is risky to assume that the Court has announced any particular rule of law, since the plurality and dissent approaches garnered only four votes each. See *United States v. Alcan Aluminum Corp.*, 315 F.3d 179, 189 (2d Cir. 2003) ("When it is not possible to discover a single standard that legitimately constitutes the narrowest ground for a decision on that issue, there is then no law of the land because no one standard commands the support of a majority of the Supreme Court."); *Anker Energy Corp. v. Consolidation Coal Co.*, 177 F.3d 161, 170 (3d Cir. 1999) ("[I]n cases where approaches differ, no particular standard is binding on an inferior court because none has received the support of a majority of the Supreme Court."). In the case of *Seibert*, the only thing we know for sure is that at least seven members of the Court rejected an intent-based approach and accepted some kind of exception to *Elstad*, even if the scope of that exception remains unclear. See *United States v. Rodriguez-Preciado*, 399 F.3d 1118, 1141 (9th Cir. 2005) (Berzon, J., dissenting).

Under these circumstances, we must continue to work with the authoritative sources that remain available to us. Up until now, we have not yet settled on a definitive approach toward the problem addressed in *Seibert*. Our first analysis of that decision in *United States v. Stewart*, 388 F.3d 1079 (7th Cir. 2004), produced a set of tentative statements. We said that

> *at least* as to *deliberate* two-step interrogations in which *Miranda* warnings are intentionally withheld until after the suspect confesses, the central voluntariness inquiry of *Elstad* has been replaced by a presumptive rule of exclusion, subject to a multifactor test for change in time, place, and circumstances from the first statement to the second.

*Id.* at 1090 (first emphasis added). We also expressed the opinion that "*Elstad appears* to have survived *Seibert*." *Id.* (emphasis added). In a later case, *United States v. Peterson*, 414 F.3d 825 (7th Cir. 2005), we did not reach the question how *Seibert* would apply, but we observed that the intent-based test was shared by only Justices Kennedy and Breyer. *Id.* at 828. We then delved into the rationale of *Seibert*:

> The thinking behind this is that a suspect who has been induced to make a statement may see little point in clamming up after warnings have been given; he may think that the cat is out of the bag. Moreover, eliciting a statement before the suspect has been informed of his rights implies that the warnings and rights are charades, which reduces the chance that the suspect will invoke his constitutional privilege.

*Id.* This reasoning appears to be defendant-focused. If that is so, then it may be in some tension with our decision in *Stewart* and Justice Kennedy's intent-based test, as the latter converts *Miranda*'s focus from a concern with the defendant's knowledge of her own rights into what looks more like a rule designed to curb abuse by the police.

We have no need here to resolve once and for all what rule or rules governing two-step interrogations can be distilled from *Seibert*. This is because Heron's May 11 statements would be admissible under any test one might extract. We agree with the district court that those statements would be admissible under Justice Kennedy's intent-based test. The district court found as a fact that there was "no evidence that the officers, during the defendant's first statement, had any intent or strategy to deliberately withhold *Miranda* warnings in an attempt to get the defendant to confess." In all likelihood, the court was relying on Scott's testimony that Heron had requested the meeting with the officers and that Scott and Rehg assumed that Heron had already been given *Miranda* warnings.

Heron argues that the court's finding was clearly erroneous. He points out that Scott testified that she had been with the DEA for nine-and-a-half years, and he argues that the court could have inferred impermissible intent directly from the fact that she failed to take the precaution of administering *Miranda* warnings before talking to Heron on May 10.

While this may have been a possible inference, the district court was not compelled to make it. We cannot

find that the court committed clear error in crediting Scott's testimony that her lack of precaution was an honest mistake. The court was entitled to conclude that it was reasonable for her to assume that Heron would have been given *Miranda* warnings upon arrest. There is also a question whether the May 10 meeting was called in response to Heron's request, or if instead someone from the Fairview Heights Police Department requested the meeting. We decline to engage in speculation about whether the police or Heron initiated the meeting, because nothing turns on it. Law enforcement cannot be expected to keep track of the identity of every person who makes a phone call on behalf of another police department.

We also see no reason to disturb the district court's conclusion that Heron gave the May 11 statement voluntarily. As it notes, "[i]t is clear that Agent Rehg gave the defendant his *Miranda* warnings before he questioned him, and that the defendant appeared to understand those warnings, but chose to waive his rights and gave his statement to Agent Rehg." Heron notes that Rehg did not obtain a written *Miranda* waiver, but this alone does not make Heron's statement involuntary. Because the May 11 statements were given voluntarily, they would be admissible under the interpretation of *Elstad* favored by the *Seibert* dissenters as well.

Finally, Heron's statements would be admissible under the approach of the *Seibert* plurality. For them, the central inquiry is whether, given the totality of the circumstances, the midstream *Miranda* warnings were

effective. The district court must weigh several factors in determining effectiveness:

> [1] the completeness and detail of the questions and answers in the first round of interrogation, [2] the overlapping content of the two statements, [3] the timing and setting of the first and the second, [4] the continuity of police personnel, and [5] the degree to which the interrogator's questions treated the second round as continuous with the first.

*Seibert*, 542 U.S. at 615. We acknowledge that some of these (unweighted) factors suggest that the court should have excluded Heron's May 11 statements. There was sufficient overlap between the May 10 and May 11 statements (and likely the questions that elicited the statements) such that the officers involved did not think it necessary to produce another DEA-6 Report for the second interrogation (Factors 1, 2, & 5). The interrogations also occurred in the same location, the Fairview Heights Police Department (Factor 3). There was some but not complete continuity of police personnel—Scott was present at both interrogations (Factor 4).

The remaining factor supports admissibility. Thirty-two hours elapsed between the first interrogation and the second (Factor 3). This contrasts with the 20-minute break in *Seibert*. *Id.* at 605. While this is a close case, nothing in the *Seibert* plurality opinion condemns us to a mechanical counting of items on a list. We must instead examine each one of them for the light it throws on the central inquiry: whether the later *Miranda* warnings were effective. Here, the lengthy temporal separation

between Heron's first and second encounters persuades us that the district court did not err when it found that the later warnings served their intended purpose. The May 11 statements thus would be admissible under the *Seibert* plurality's approach. Any way we look at the problem, in summary, we conclude that the district court correctly concluded that Heron's May 11 statements were admissible. They may therefore be used in any further proceedings conducted by the district court.

* * *

For these reasons, we REVERSE the court's judgment of conviction and REMAND for further proceedings consistent with this opinion.