*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellant,

v

DANIEL DELATORRE,

        Defendant-Appellee.

UNPUBLISHED
January 26, 2023

No. 359394
Wayne Circuit Court
LC No. 21-001138-01-FC

Before: SWARTZLE, P.J., and CAVANAGH and REDFORD, JJ.

PER CURIAM.

When police elicit a confession from a defendant in custody before any *Miranda*[1] warning, and then elicit a similar confession after a *Miranda* warning, does the second confession have to be suppressed? As explained here, the second confession must be suppressed when "the two-step interrogation technique was used in a calculated way to undermine the *Miranda* warning" and curative measures were not taken. *Missouri v Seibert*, 542 US 600, 622; 124 S Ct 2601; 159 L Ed 2d 643 (2004) (Kennedy, J., concurring). Under this standard, the trial court suppressed defendant's post-*Miranda* confession, and we find no error requiring reversal and affirm.

## I. BACKGROUND

A fight broke out between two groups of people at a nightclub, and the victim was allegedly involved in the altercation when it continued onto the street outside. As the victim was standing in the street, a silver pickup truck with only one working taillight struck him and ran him over. The truck then sped off. This was recorded on security footage by a nearby business. The victim was taken to a hospital, where he died a few days later from his injuries.

The police watched the security footage, and, several hours after the hit and run, Detroit Police Sergeant Samuel Mackie spotted a truck that matched the description of the truck in the video. Defendant was driving the truck when Sergeant Mackie pulled the truck over, and there

---

[1] *Miranda v Arizona*, 384 US 436; 86 S Ct 1602; 16 L Ed 2d 694 (1966).

were no other passengers in the truck. Sergeant Mackie requested that a Spanish-speaking officer assist him because it was clear to Sergeant Mackie that English was not defendant's primary language. Detroit Police Officer Timothy Murray responded that he was fluent in Spanish and English, but he could not translate "legal jargon" into Spanish. When Officer Murray arrived, defendant was handcuffed and sitting on the street curb. Officer Murray's body-camera footage recorded him assisting Sergeant Mackie and other officers in communicating with defendant. The body-camera footage demonstrated that defendant was surrounded by at least four officers at all times during his questioning, and an officer was physically holding defendant's arm for more than 10 minutes.

Sergeant Mackie, through Officer Murray's translations, began by asking defendant where and with whom he lived. Sergeant Mackie's questions clearly insinuated that there was an accomplice with defendant in the video. Defendant, while handcuffed, retrieved his phone from his pocket and unlocked it to get his roommate's contact information. Sergeant Mackie then said "let me see" and took the phone from defendant's hand. The officers briefly looked through the contact information on defendant's phone, and the phone locked itself after not being used for a few seconds. Sergeant Mackie then asked defendant for the phone's passcode. Once the phone was unlocked again, Sergeant Mackie asked defendant which number was his roommate's number and he then asked Officer Murray to translate the information on the phone. After reading through defendant's text messages, Sergeant Mackie exclaimed that it "sounded like" defendant was selling drugs.

Thirteen minutes after Officer Murray began translating for Sergeant Mackie, Sergeant Mackie told defendant that "they knew what he did," and that they wanted to know "who did you hit." Defendant responded by saying, "just tell me what I did" because he did not "know what was going on." The officers asked him if he was driving the truck in the early morning hours, and defendant responded that he was driving the truck. Sergeant Mackie then instructed Officer Murray to tell defendant that he was "going to lock him up for homicide." Sergeant Mackie asked again, "You were driving the truck? You ran the guy over?" Defendant nodded his head in agreement, and then answered that he did not know whom he hit. Defendant insisted that he was driving the truck and he was alone, even though officers asked who else was in the video with him.

Defendant offered a full admission, before being read his *Miranda* rights, 15 minutes after Officer Murray first began translating for Sergeant Mackie. Sergeant Mackie continued to ask who else was driving the truck, and he warned defendant that the police were going to check the truck for fingerprints. Twenty minutes after Officer Murray began translating for Sergeant Mackie, defendant offered another confession that he was driving the truck and hit the victim. Sergeant Mackie then spoke with Officer Murray, saying, "Looking at the video, he's not the driver. I don't want to see this guy get locked up for something he didn't do." Sergeant Mackie then instructed the officers to put defendant in the back of a patrol car.

Sergeant Mackie then found online a *Miranda*-rights warning in Spanish, and he had Officer Murray translate it back to him in English to double-check that it was a proper warning. Sergeant Mackie then instructed Officer Murray to read the *Miranda* rights in Spanish to defendant because they were going to ask defendant "again if he was the driver." Twenty-eight minutes after Officer Murray first began translating for Sergeant Mackie, Officer Murray advised defendant of his *Miranda* rights, and defendant indicated that he understood his rights. Sergeant Mackie asked

defendant to explain again what occurred, and defendant stated that he and his friends got into a fight at the nightclub. Defendant continued that while he was driving his truck, the victim got in the way and he hit him. Defendant said he asked bystanders if the victim was injured, and that they told him that they would take the victim to the hospital. Defendant was charged with first-degree murder, MCL 750.316, failure to stop at the scene of an accident resulting in death, MCL 257.617, and assault with a dangerous weapon, MCL 750.82.

The district court ruled that all of defendant's statements were inadmissible, but the district court otherwise bound defendant over on evidence that is not pertinent to this appeal. After defendant was bound over, the prosecutor moved the circuit court to admit the statement that defendant gave after he had been advised of his *Miranda* rights, and defendant moved to suppress that statement.

The circuit court held an evidentiary hearing to address the competing motions, and it issued a written opinion concerning defendant's statements. It specifically found:

> While the testimony and evidence introduced at the evidentiary hearing seem[] to reflect a sincere belief by Sgt. Mackie that someone other than Mr. Delatorre struck and severely injured the victim, it is also clear that Sgt. Mackie knew or had reason to believe that Mr. Delatorre may have been involved in an altercation that led up to the incident under investigation. After a prolonged series of questions, Sgt. Mackie instructed Officer Murray to tell Mr. Delatorre that Sgt. Mackie knew that Mr. Delatorre was at the Caribbean night club the previous night. Sgt. Mackie also had Officer Murray tell Mr. Delatorre that Mr. Delatorre needed to stop lying. After Sgt. Mackie asked for the identity of the person driving the vehicle that struck the victim the previous evening, Mr. Delatorre admitted that he was the driver. At that point, Sgt. Mackie did not cease questioning; but rather, he advised Mr. Delatorre that he would be locked up for homicide and continued to ask numerous questions about the incident without advising Mr. Delatorre of his *Miranda* rights. It was only after Mr. Delatorre provided more details about his involvement and again admitted that he was the driver that he was placed in the rear seat of a patrol vehicle and advised of his *Miranda* rights in Spanish. Mr. Delatorre verbally indicated that he understood his *Miranda* rights, agreed to respond to questions, and again admitted that he was the driver of the truck that struck and injured the victim.
>
> Assuming, arguendo, that Sgt. Mackie's questions to Mr. Delatorre were part of an effort to identify and apprehend someone other than Mr. Delatorre and not a deliberate effort [to] undermine *Miranda* by engaging in a two-step interrogation that was the center of the *Seibert* decision, after Mr. Delatorre admitted that he was the driver of the truck that struck and severely injured the victim, questioning should have ceased until Defendant was advised of his *Miranda* rights. Sgt. Mackie's decision not to provide *Miranda* warnings to Mr. Delatorre and to instead continue questioning makes this case distinguishable from the facts in [*Oregon v Elstad*, 470 US 298, 309; 105 S CT 1285; 84 L Ed 2d 222 (1985)] and substantially similar to the facts in *Seibert*.

-3-

In this case, during the second round of questioning Mr. Delatorre was asked to repeat the admissions that he made before he was provided with his *Miranda* rights, there was no break in questioning between the first interrogation and the post-*Miranda* questions, the same officers were involved in both interrogations, and the post-*Miranda* questions were, in essence, a continuation of the questioning. While Justice Kennedy did not adopt the multi-part test advanced by the majority in *Seibert*, it also clear that the curative measures referenced by Justice Kennedy were not utilized in this case. There was not a substantial break in time and circumstances between the prewarning statement and the *Miranda* warning or an additional warning of the likely inadmissibility of the prewarning statement. Moreover, in that there was no evidence that Mr. Delatorre had prior contacts with law enforcement or the justice system, one cannot assume that he understood his *Miranda* rights before this incident and knowingly waived them.

Ultimately, the circuit court held that *Seibert* required suppression of defendant's statement after he was advised of his *Miranda* rights because it was a continuation of the officer's questioning before defendant had been advised of his rights, and the officers had not taken curative measures to ensure defendant's rights. This Court granted leave to consider the prosecutor's interlocutory appeal. *People v Daniel Delatorre*, unpublished order of the Court of Appeals, entered March 15, 2022 (Docket No. 359394).

## II. ANALYSIS

This Court reviews de novo a trial court's decision on a motion to suppress. *People v Hyde*, 285 Mich App 428, 436; 775 NW2d 833 (2009). It also reviews de novo questions of constitutional law. *People v Sadows*, 283 Mich App 65, 67; 768 NW2d 93 (2009). A trial court's findings of fact are reviewed for clear error. *Hyde*, 285 Mich App at 436. "A finding is clearly erroneous if, after reviewing the entire record, this Court is definitely and firmly convinced that the trial court made a mistake." *People v Swenor*, 336 Mich App 550, 563-564; 971 NW2d 33 (2021).

Defendant made several inculpatory statements, both before and after being advised of his *Miranda* rights. "*Miranda* warnings are not required unless the accused is subject to a custodial interrogation." *People v Steele*, 292 Mich App 308, 316; 806 NW2d 753 (2011). "Generally, a custodial interrogation is a questioning initiated by law enforcement officers after the accused has been taken into custody or otherwise deprived of his or her freedom of action in any significant way." *Id*. Defendant was flanked by multiple police officers, he was put in handcuffs behind his back, and his arm was physically held by an officer during most of the questioning. The prosecutor correctly concedes that defendant was in custody. Therefore, defendant was entitled to be advised of his *Miranda* rights prior to any questioning by the police here.

Even though the police improperly questioned defendant without advising him of his *Miranda* rights, the police's error does not necessarily bar the use of subsequent inculpatory statements made by defendant after he had been advised of his rights. "Though *Miranda* requires that the unwarned admission must be suppressed, the admissibility of any subsequent statement should turn in these circumstances solely on whether it is knowingly and voluntarily made." *Elstad*, 470 US at 309.

In *Elstad*, 470 US at 301, the defendant, without being advised of his *Miranda* rights, confirmed to the police that he had been to the scene of a burglary. The police then arrested the defendant and took him to the police station where he provided a full confession after he was advised of his *Miranda* rights. *Id*. The *Elstad* Court held that the subsequent confession was admissible because it was not a consequence of the prior *Miranda* violation, and it reasoned that even in extreme cases "in which police forced a full confession from the accused through unconscionable methods of interrogation, the Court has assumed that the coercive effect of the confession could, with time, be dissipated." *Id*. at 311-312, 318. Thus, a violation of *Miranda* need not be fatal to the prosecutor's use of subsequent inculpatory statements in all cases.

The United States Supreme Court returned to the issue in *Missouri v Seibert*. In that case, the Court considered the constitutionality of "interrogating in successive, unwarned and warned phases." *Seibert*, 542 US at 609. The police admitted that they deliberately used a "two-stage interrogation" where they first elicited a confession from the defendant without advising her of her *Miranda* rights, and then they followed up with questioning when they elicited the same confession after advising the defendant of her *Miranda* rights. *Id*. at 610-611. One officer described this as a technique specifically designed to evade the requirements of *Miranda*. *Id*. at 611.

The *Seibert* Court was unable to reach a majority consensus, and instead its decision was fragmented into a four-justice plurality, separate concurrences from Justices Kennedy and Breyer, and a three-justice dissent. Although the *Seibert* plurality and Justice Kennedy agreed in the outcome, their analyses differed.

The *Seibert* plurality stated:

The threshold issue when interrogators question first and warn later is thus whether it would be reasonable to find that in these circumstances the warnings could function 'effectively' as *Miranda* requires. Could the warnings effectively advise the suspect that he had a real choice about giving an admissible statement at that juncture? Could they reasonably convey that he could choose to stop talking even if he had talked earlier? For unless the warnings could place a suspect who has just been interrogated in a position to make such an informed choice, there is no practical justification for accepting the formal warnings as compliance with *Miranda*, or for treating the second stage of interrogation as distinct from the first, unwarned and inadmissible segment. [*Id*. at 611-612 (opinion by Souter, J.).]

The plurality went on to determine that advising a defendant of her *Miranda* rights, in the middle of the interrogation, is not effective unless "a reasonable person in the suspect's shoes would [] have understood them to convey a message that she retained a choice about continuing to talk." *Id*. at 617. In reaching this conclusion, the plurality identified five facts that distinguished *Seibert* from other cases, like *Elstad*, in which inculpatory statements were given both before and after a *Miranda* warning.

The contrast [in] this case reveals a series of relevant facts that bear on whether *Miranda* warnings delivered midstream could be effective enough to accomplish their object: the completeness and detail of the questions and answers in the first round of interrogation, the overlapping content of the two statements, the timing

and setting of the first and the second, the continuity of police personnel, and the degree to which the interrogator's questions treated the second round as continuous with the first. [*Id*. at 615 (cleaned up).]

In his concurring opinion, Justice Kennedy agreed with the plurality that the defendant's post-warning confession was inadmissible, but he opined that the plurality's test was too broad. *Id*. at 622 (Kennedy, J., concurring). Justice Kennedy favored "a narrower test applicable only in the infrequent case, such as we have here, in which the two-step interrogation technique was used in a calculated way to undermine the *Miranda* warning." *Id*.

In Justice Kennedy's view, the threshold question should be whether the interrogating officer deliberately withheld *Miranda* warnings "to obscure both the practical and legal significance of the admonition when finally given." *Id*. at 620 (Kennedy, J., concurring). Justice Kennedy contended that "[t]he admissibility of postwarning statements should continue to be governed by the principles of *Elstad* unless the deliberate two-step strategy was employed." *Id*. at 622 (Kennedy, J., concurring). If the interrogating officer acted deliberately, then the postwarning statements "must be excluded unless curative measures [were] taken" to "ensure that a reasonable person in the suspect's situation would understand the import and effect of the *Miranda* warning and of the *Miranda* waiver." *Id*. Justice Kennedy gave two examples of possible curative measures: (1) "a substantial break in time and circumstances between the prewarning statement and the *Miranda* warning"; and (2) "an additional warning that explains the likely inadmissibility of the prewarning custodial statement." *Id*.

The plurality and Justice Kennedy's concurrence differ in the threshold question that would trigger scrutiny beyond *Elstad*'s analysis. The plurality's test applies to all situations in which a confession is elicited by police interrogation both before and after a defendant is advised of the *Miranda* rights, regardless of any intent by police to skirt around *Miranda*:

> The unwarned interrogation was conducted in the station house, and the questioning was systematic, exhaustive, and managed with psychological skill. When the police were finished there was little, if anything, of incriminating potential left unsaid. The warned phased of questioning proceeded after a pause of only 15 to 20 minutes, in the same place as the unwarned segment. When the same officer who had conducted the first phased recited the *Miranda* warnings, he said nothing to counter the probable misimpression that the advice that anything [the defendant] said could be used against her also applied to the details of the inculpatory statement previously elicited. [*Id*. at 616.]

\* \* \*

> The impression that the further questioning was a mere continuation of the earlier questions and responses was fostered by references back to the confession already given. It would have been reasonable to regard the two sessions as parts of a continuum, in which it would have been unnatural to refuse to repeat at the second stage what had been said before. These circumstances must be seen as challenging the comprehensibility and efficacy of the *Miranda* warnings to the point that a

reasonable person in the suspect's shoes would not have understood them to convey a message that she retained a choice about continuing to talk. [*Id*. at 616-617.]

This differs from Justice Kennedy's approach, which only applies to situations when the police have undertaken a deliberate strategy to undermine *Miranda* protections:

The plurality concludes that whenever a two-stage interview occurs, admissibility of the postwarning statement should depend on "whether [the] *Miranda* warnings delivered midstream could have been effective enough to accomplish their object" given the specific facts of the case. This test envisions an objective inquiry from the perspective of the suspect, and applies in the case of both intentional and unintentional two-stage interrogations. In my view, this test cuts too broadly. *Miranda*'s clarity is one of its strengths, and a multifactor test that applies to every two-stage interrogation may serve to undermine that clarity. I would apply a narrower test applicable only in the infrequent case, such as we have here, in which the two-step interrogation technique was used in a calculated way to undermine the *Miranda* warning. [*Id*. at 621-622 (Kennedy, J., concurring) (cleaned up).]

Federal circuit courts are divided on which approach is the controlling one. See, e.g., *United States v Guillen*, 995 F3d 1095, 1116 (CA 10, 2021) (favoring Justice Kennedy's concurrence); *United States v Heron*, 564 F3d 879, 884-885 (CA 7, 2009) (favoring the plurality opinion). There is no controlling precedent in this State, though most panels have relied on Justice Kennedy's more narrow concurrence. See, e.g., *People v Root*, unpublished per curiam opinion of the Court of Appeals, issued August 31, 2017 (Docket No. 331123), p 9 ("In this case, the evidence does not suggest that the detectives engaged in a deliberate two-stage interrogation technique designed to evade the requirements of *Miranda*."); *People v Bush*, unpublished per curiam opinion of the Court of Appeals, issued June 27, 2017 (Docket No. 330589), p 15 ("If the police deliberately refrain from advising a defendant of his rights in order to obtain a confession and, after obtaining the confession, then advise the defendant of his rights and obtain the same confession, the *Miranda* warning is ineffective, and the postwarning statement is inadmissible."); *People v Mancill*, unpublished per curiam opinion of the Court of Appeals, issued May 26, 2016 (Docket No. 325641), p 8 ("If, however, the police deliberately refrain from advising a defendant of his rights in order to obtain a confession and, having once obtained the confession, then advise the defendant of his rights and obtain the same confession, the *Miranda* warning is ineffective and the postwarning statement is inadmissible.")

Although we recognize that the bench and bar would benefit from clarity on which approach is the appropriate one in Michigan, we cannot provide that clarity here. This is because under either approach, the police officers' actions require the exclusion of defendant's statements. Any analysis with regard to which approach is the proper one would be mere dicta. Accordingly, we assume without deciding that Justice Kennedy's more narrow standard is the controlling one.

The record, as set forth by the circuit court, makes plain that the police engaged in a calculated, two-stage interrogation of defendant that was intended to elicit incriminating evidence from him. Specifically, defendant was asked to repeat his inculpatory statements, there was no break in between the police asking defendant questions before and after defendant was advised of

his *Miranda* rights, and the same officers were involved in the questioning. The circuit court recognized that, even if it assumed that the police were not deliberately trying to undermine defendant's *Miranda* rights, the police should have ceased questioning and advised defendant of his *Miranda* rights as soon as he made inculpatory statements.

When reviewing the record, it is clear that the police waited nearly 15 minutes to advise defendant of his rights after he had already confessed, and they continued asking defendant questions that elicited inculpatory answers before advising him of his *Miranda* rights. There is also no question that the police officers' questions were calculated to elicit inculpatory responses, even if they assumed that defendant would not be admitting to the crimes for which he is now charged. This is exemplified by the fact that the officers went through defendant's phone and insinuated that defendant was dealing drugs after translating his text messages. The police also asked defendant about those text messages without advising him of his *Miranda* rights.

The circumstances in this case are not akin to the facts in *Elstad*, where the officers may not have realized the suspect was in custody or that warnings would be required. In this case, defendant's subsequent confession was clearly a consequence of his first confession that was in violation of his *Miranda* rights. Additionally, the nature of the questions that the officers asked, and the answers that defendant gave, clearly should have been done within a *Miranda* context. This is unlike the situation in *Elstad*, where the officers could not reasonably have known that their questions would elicit a confession. There was also no substantial break in the time between the confessions, or the scene of the confession, by which the coercive effect of the first confession would have dissipated.

Instead, these facts trigger the analysis provided by Justice Kennedy in *Seibert* because a two-step strategy, with questions calculated to elicit inculpatory statements, was employed by the officers. The record shows that the interrogating officer acted deliberately by asking questions that were calculated to elicit a confession, even if those questions were attempting to elicit a confession to a crime for which defendant was not charged. Additionally, the questions and answers that were provided before defendant was advised of his *Miranda* rights were detailed and complete, asking defendant if he was driving the truck when it struck the victim. In fact, the officers treated the second round of questions as continuous with the first, as exemplified by Sergeant Mackie's exclamation that they were "going to ask [defendant] again if he was the driver" after advising him of his *Miranda* rights. Lastly, the officers who began the initial questioning also advised defendant of his *Miranda* rights, and also continued to interrogate him after that advisement.

There was not a substantial break in time and circumstances between the prewarning statement and the *Miranda* warning as defendant was placed in the back of a police car, advised of his *Miranda* rights, and re-questioned within 20 minutes. There was also no explanation, or additional warning, explaining to defendant that his prewarning statements were likely inadmissible. Therefore, there were not curative measures taken to ensure that a reasonable person in defendant's situation would understand the effect of the *Miranda* warning.

### III. CONCLUSION

For the reasons state here, we are not left with a definite and firm conviction that the circuit court erred when finding that the police officers engaged in a calculated two-stage interrogation. Further, the circuit court did not err when granting defendant's motion to suppress because, when applying Justice Kennedy's concurrence, there was not "a substantial break in time and circumstances between the prewarning statement and the *Miranda* warning," and there was not "an additional warning that explain[ed] the likely inadmissibility of the prewarning custodial statement[s]." *Seibert*, 542 US at 622 (Kennedy, J., concurring). Therefore, we affirm the circuit court's suppression of defendant's statements.

/s/ Brock A. Swartzle
/s/ Mark J. Cavanagh
/s/ James Robert Redford