DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA
FOURTH DISTRICT

**JOEL DE LA OSA,**
Appellant,

v.

**STATE OF FLORIDA,**
Appellee.

No. 4D11-4898

[February 18, 2015]

Appeal from the Circuit Court for the Seventeenth Judicial Circuit, Broward County; Jeffrey R. Levenson, Judge; L.T. Case No. 03-12101CF10G.

Teresa Williams of Williams and Trese, LLP, Fort Lauderdale, for appellant.

Pamela Jo Bondi, Attorney General, Tallahassee, and Cynthia L. Comras, Assistant Attorney General, West Palm Beach, for appellee.

GROSS, J.

In a 90 page indictment filed in 2003, appellant Joel de la Osa, along with 17 other defendants, was charged with crimes arising from an elaborate scheme spearheaded by Michael Carlow to sell adulterated prescription drugs to wholesale distributors, thus ensuring the drugs' placement on the retail market. The State's theory of the case was that Michael Carlow organized a conspiracy in which he and others marketed illicitly obtained prescription drugs to legitimate prescription drug wholesalers, with the other named co-defendants forming his criminal enterprise. De la Osa illegally provided prescription drugs to Carlow in exchange for money, which Carlow then resold to drug wholesalers, who in turn sold the drugs to unsuspecting consumers at full price. After a 2011 jury trial where he was tried with co-defendant Arturo Godinez, de la Osa was convicted of racketeering, conspiracy to commit racketeering, and organized scheme to defraud.

We affirm the convictions for conspiracy to commit racketeering and organized scheme to defraud, but reverse the racketeering conviction

because the State failed to prove that de la Osa committed the two predicate acts required by the Florida RICO (Racketeer Influenced and Corrupt Organization) Act, sections 895.01-895.06, Florida Statutes (2003).

### *Prescription Drug Sales in Florida*

To provide context, the State called the staff director for the Florida Senate Committee on Health Regulation to testify about the regulation and distribution of prescription drugs in Florida from 2001 through 2003. The staff director explained that prescription drug sales have, at all times, been "tightly regulated" both in Florida and throughout the country; in general, the federal Food and Drug Administration must approve the manufacture and sale of a drug, the drug must go through licensed entities in the distribution chain, and the drug must ultimately be dispensed by a licensed pharmacy or practitioner.

In Florida, wholesale distributors wishing to directly participate in the state's prescription drug market were required to obtain permits, depending on their level of interaction. In-state drug wholesaler permits allowed business entities to purchase, store, and sell prescription drugs from specific business locations, provided the business maintained certain minimum standards such as a security system and appropriate storage facilities. Use of a private residence as a storage facility would not suffice. By contrast, a prescription drug broker permit allowed an entity to purchase drugs from approved sources and sell them to approved purchasers without the strict storage facility requirement, so long as the broker never took possession of the drugs.

Florida statutes required that prescription drugs be sold with "pedigrees"—documents created by the wholesaler that trace the distribution channel of the drug from the manufacturer to the party that dispenses the drug to the consumer. From 2001 through 2003, Florida's pedigree requirements were more stringent than their federal counterparts; federal statutes established in 1988[1] required pedigrees to only go back to an authorized distributor of record, which was a wholesale distributor "that had an ongoing relationship with the manufacturer."[2] In either respect, the purpose of pedigrees was to ensure that licensed

---

[1] The federal rules to implement the pedigree requirement did not go into effect until 2006.

[2] Typically, authorized distributors were companies with contracts to purchase large quantities of pharmaceuticals from manufacturers.

wholesalers purchased drugs only from manufacturers or other licensed wholesalers; purchasing prescription drugs from patients, pharmacies, clinics, or doctors was strictly prohibited.

Through 2002, the Florida Department of Health "loosely regulated" the pedigree requirement, resulting in violations not being "aggressively enforced." To combat rampant noncompliance, the Department notified drug wholesalers of its intent to enforce the pedigree requirements mandating documentation dating back to the drugs' manufacturers. The result was a backlash from the drug sale industry, as many wholesalers expressed concerns that strict enforcement of Florida's pedigree laws would be untenable. After establishing a task force, Florida's Secretary of Health submitted a February 18, 2002 advisory letter to the Department, essentially conforming Florida's pedigree laws with federal practice, stating that authorized distributors need not pass a pedigree and that wholesale distributors need only provide pedigrees to the last authorized distributor. However, pedigrees from non-authorized wholesale distributors remained a necessity.

Despite this enforcement relaxation, the staff director testified that the Department's definition of an "adulterated" prescription drug remained static. In July 2003, following the collapse of the Carlow enterprise, the Florida Legislature amended section 499.006, Florida Statutes, to define an "adulterated drug or device" as drugs either sold without pedigree papers or "purchased, held, sold, or distributed at any time by a person not authorized under federal or state law to do so." In addition, the Legislature amended the racketeering statutes to make violations of Chapter 499—specifically sections 499.0051, 499.0052, 499.0053, 449.0054, and 499.9691—predicate acts.[3] Nevertheless, the staff director explained that prior to these amendments, the Department considered drugs that were stored in unlicensed facilities, purchased from non-approved sources, counterfeited, mislabeled, or accompanied by a false or fraudulent pedigree to be adulterated.

### *The Prescription Drug Sale Conspiracy*

---

[3]In 2003, the Legislature amended section 895.02, Florida Statutes, to include section 499.0051 violations as predicate acts for RICO cases. Ch. 2003-155, § 31, Laws of Fla. Section 499.0051 now criminalizes the failure to keep pedigree papers, sales of prescription drugs to unlicensed persons, purchases of drugs from unlicensed persons, and other offenses relating to improper trafficking in prescription drugs. This amendment did not become effective until after the period charged in the indictment, and this provision could not have been used as a predicate offense in de la Osa's case.

In this case, the State established that Michael Carlow owned and operated several companies, licensed under other persons' names, that sold prescription drugs to prescription drug wholesalers. After acquiring prescription drugs through a variety of illicit sources, including stolen and relabeled drugs, Carlow and his associates stored the drugs in unapproved locations, including their homes. Carlow and his associates fabricated invoices and false pedigrees to give the appearance that the drugs were properly obtained. The group then sold the drugs to drug wholesalers throughout the country—particularly Albers in Missouri—and the drugs were, presumably, purchased by consumers at full retail price. One of Carlow's former employees estimated that over seventy-five percent of the drugs were shipped to wholesalers outside Florida.

On appeal, de la Osa raises a judgment of acquittal argument directed at the structure of Carlow's entire scheme under conspiracy law. With Carlow's rise, several individuals, including de la Osa, formed pharmaceutical wholesale businesses to latch on to Carlow's enterprise and turn a profit as Carlow's suppliers. As a supplier, de la Osa contends the scope of his conspiracy extends only to Carlow and not to the other suppliers. If he cannot be held responsible for the criminal acts of the other suppliers, de la Osa asserts that the State proved his involvement in only one predicate act, thus negating his convictions for racketeering and conspiring to racketeer.

To evaluate de la Osa's argument, we examine the proof at trial as it involved each cog in the conspiracy's machine.

*Michael Carlow – The Hub*

The conspiracy's origins date back to July 1998, when Carlow obtained a permit to operate Medical Infusion Services, a wholesale pharmaceutical business. Medical Infusion bought unused AIDS medication from patients being treated at Carlow-owned clinics. To effectuate the operation, Carlow introduced employee Mark Novosel to de la Osa's co-defendant, Arturo Godinez, stating that Godinez "would be sending [Novosel] the medications that he used to get." Under this agreement, Godinez sold Medical Infusion "a lot of cancer drugs," specifically a drug called Lupron.

In early 2000, Carlow was arrested for purchasing drugs from unlicensed dealers and the State of Florida revoked Medical Infusion's license. Several months later, Carlow started a new prescription drug wholesale business called MedRx and licensed it in Florida under Novosel's then-girlfriend's name, telling Novosel that Godinez would continue to be a supplier. MedRx began receiving drugs without pedigrees, although

Novosel did not know their sources or where the drugs were sold. Novosel and Carlow then fabricated pedigrees for the drugs, listing drug manufacturers as the source so the drugs could be resold on the open market.

Around the time MedRx was formed, Carlow masterminded three additional pharmaceutical businesses relevant to this case: Accucare, LLC; BTC Wholesale; and G&K Pharma, LLC. Accucare was incorporated in Florida under the name of Carlow's wife—with Carlow serving as "President"—and became licensed for pharmaceutical sales in another state. BTC Wholesale, based in Kissimmee, obtained a Florida wholesale distributor permit on August 10, 2001, under the name of Carlow's brother-in-law, Thomas Atkins, Jr., a mattress salesman prior to the formation of BTC. Finally, G&K Pharma was a licensed wholesale distributor based in numerous states—most notably, Maryland—which never obtained a Florida drug wholesaler permit. Each of these businesses would later serve as conduits for selling illegally obtained prescription drugs.

*Joel de la Osa – A Supplier*

Appellant de la Osa's role in the enterprise was as one of Carlow's suppliers. Prior to his entanglement in the pharmaceuticals industry, de la Osa was a mechanic who owned and operated a repair shop. Despite having no medical or pharmaceutical experience, in May 2002, de la Osa found himself the named founder of Complete Wholesale ("Complete"), a prescription drug wholesale distributor that shared an office with G&K Pharma in Maryland.

De la Osa's ascendance to be the founder of Complete developed under the influence of Henry Garcia, a more direct cohort of Carlow. Before Complete's formation, Garcia and two others—Guillermo Rigo and Fabian Diaz—formed RGD, a wholesale pharmaceutical company based in North Carolina. Initially, RGD worked with L&L Distributors, a Florida wholesale pharmaceutical distributor, to provide false pedigrees using RGD's license. However, RGD's role expanded once L&L Distributors' owner introduced Garcia to Carlos Ozete, a source for acquiring cheap pharmaceutical products and a friend of de la Osa.

Following Ozete's integration, RGD reached an agreement with Carlow to provide Accucare and BTC Wholesale with the pharmaceutical products RGD could obtain through Ozete. Within this operation, Garcia and Diaz met "car-to-car" with Ozete at differing locations—such as gas stations and malls—to physically obtain the pharmaceutical products without pedigree

papers despite not knowing Ozete's sources. Thereafter, Garcia and Diaz would drive to Carlow's house in Weston, Florida, where they would meet Carlow in his garage and complete the exchange. As part of the process, Diaz provided Garcia with company names to formulate phony pedigrees.

Things changed in January 2002, when Garcia and Ozete unknowingly sold Carlow products that had been stolen during a South Miami robbery. The hot transfer resulted in law enforcement tracking the drugs to BTC Wholesale, where they executed a search warrant on the business, interviewed Carlow's brother-in-law, and eventually searched Carlow's house. Given the tenuous situation, BTC Wholesale shut down and the exchanges at Carlow's house ceased. Instead, the sales began taking place at a Hialeah efficiency rented by Garcia and Ozete.

To make the exchanges appear more legitimate, Carlow suggested Garcia and Ozete form their own wholesale pharmaceutical company. Taking the advice to heart, Ozete—with Garcia's blessing—convinced his friend, de la Osa, in May 2002 to head Complete, which set up shop in the same building as Carlow's G&K Pharma branch in Maryland. To bring the plan to fruition, G&K Pharma's sole employee, Sam Whatley, assisted de la Osa in setting up the business by obtaining licenses and creating a joint bank account, with himself and de la Osa as signatories. Under the group's agreement, de la Osa would receive 1% of Complete's proceeds for signing checks, while Garcia and Ozete would each receive 1 ½% for their involvement.

During the course of the endeavor, Garcia began to obtain pharmaceutical products without pedigrees from a person named Rogelio Ramos. Garcia later learned Ramos acquired much of his drugs from Juan Carlos Viera, who lived down the street from de la Osa's mother. Upon receiving the drugs from Ramos, Garcia "repack[ed] them, put [them] in boxes, and" shipped them out directly to Carlow's buyer—typically Albers—with invoices from G&K Pharma. Carlow's secretary, Gina Catapano, created the phony pedigrees. In exchange, checks generated from Complete paid what amounted to over $500,000 to Ramos's non-pharmaceutical company, Bills R Us.

The plan eventually unraveled on October 1, 2002, over a shipment of Procrit provided by Ozete. Through a deliveryman, David Ebanks, Garcia shipped the Procrit to Baltimore, where it was eventually shipped by G&K Pharma, as licensed by Two M Enterprises, to Roberts Drug Store in Miami. When a runner arrived to pick up payment for the shipment, he was met by law enforcement, who seized the drugs as adulterated. With the runner's assistance, the investigation quickly moved up the chain of

command as authorities questioned Sam Whatley at G&K Pharma regarding where he received the drugs. Within weeks, Ozete left for Puerto Rico, never to be heard from again, and Complete closed up shop.

Not satisfied by Complete's haul, de la Osa in early 2003 approached his brother-in-law, Dariel Tabares, about starting a Texas pharmaceutical company named Pormis under Tabares's name. De la Osa's pitch was that Complete had paperwork problems such that he could not open up another company himself. Despite having no background in pharmaceuticals, Tabares agreed to the ruse and obtained the necessary licenses, telling inspectors that one of the company's likely customers would be G&K Pharma. Like de la Osa before him, Tabares was to receive 1% of the company's proceeds for opening bank accounts and signing checks. De la Osa received the checks after they were signed.

At trial, Tabares testified that during his time as head of Pormis, de la Osa personally introduced him to Carlow, telling Tabares, "He's going to help us out with Pormis." Additionally, de la Osa introduced Tabares to Rogelio Ramos in the context of a construction project. In fact, de la Osa became so close with Ramos that Tabares later saw Ramos at a birthday party for de la Osa's daughter.

The money quickly started pouring in and de la Osa sought a way to increase his profits by cutting Carlow out of the distribution chain. Noah Salcedo was an employee of a consulting firm for Albers in Missouri who functioned as Carlow's "in" for getting Albers to purchase his adulterated pharmaceutical products. Following the formation of Pormis, de la Osa contacted Salcedo about selling pharmaceutical products—HIV and cancer medication—directly from Pormis to Albers, cutting Carlow out. In the phone conversation, de la Osa mentioned to Salcedo that he had previously sold prescription drugs to Albers through Carlow. Not wanting to step on any toes, Salcedo immediately contacted Carlow who did not take the news well. As a result, Salcedo accepted de la Osa's offer only once but permitted Pormis to continue their exchanges through Carlow's businesses.

Everything came to a head on May 20, 2003, in what became known as the Pak Mail incident—a seizure in Miami of six cartons full of adulterated pharmaceuticals worth over $600,000. The shipment was addressed from G&K Pharma to Pormis Wholesale Distributions at a Pak Mail where de la Osa had a box registered in his name. Upon the drugs' arrival, Tabares received a phone call informing him the drugs were ready for pickup. Not aware of what was going on, Tabares called de la Osa, who assured Tabares not to "worry about it." Shortly after the seizure, Pormis shut

down and Garcia and de la Osa made plans to start up another pharmaceutical wholesale company. The plan never came to fruition, however, as the two were arrested in July 2003.

*Arturo Godinez - Co-Defendant and Another Supplier*

Like de la Osa, co-defendant Arturo Godinez's role within the scheme was to supply Carlow with cheap pharmaceuticals. At trial, Mark Siegel, who was hired by Carlow in 2001 to work as a telemarketer to buy and sell inventory for the wholesale pharmaceutical business, testified that he went to one of Godinez's businesses, a commercial plant nursery, and picked up four large boxes of various pharmaceuticals, including AIDS medications, which were eventually shipped either to Albers or delivered locally. Sometime later, Siegel performed another pick-up at the same nursery, receiving a box and bag filled with pharmaceuticals, which Siegel delivered to an owner of a drug wholesaler in Florida. At the time, Siegel believed the pharmaceuticals he received from Godinez's nursery were not diluted or counterfeit.

To further the drug sales, Godinez partnered with Ovidio Pena, a person he met in 1997 or 1998 when Pena sold him medical equipment. After the two moved into the same apartment building in 1999, Godinez told Pena (1) that he sold HIV medications to Carlow, making "a million" in the process, and (2) that he purchased the HIV medications from HIV patients.

At trial, Pena described a prescription drug sale that involved Godinez. Godinez purchased Lupron from doctors who were able to obtain the drug at a twenty percent discount through a business he owned. Pena then sold the drugs to another company called Gemco. Godinez, Pena, and the others involved in the deal received a $60,000 profit. Pena also sold medications he bought "from patients on the street" to Carlos Ozete, who then sold those drugs to Carlow.

*Julio Cruz – The International*

Arguably the largest of Carlow's suppliers was Julio Cruz.[4] Unlike de la Osa and Godinez, Cruz worked on an international scale, illegally importing Celebrex and Lipitor primarily from Brazil. Essentially, Cruz

---

[4]There were other named co-defendants involved in Cruz's scheme, including Ivan and Lazaro Villarchao and Tom Martino. Since none of those co-defendants testified at trial, and to simplify the facts, we have omitted the description of the involvement of these co-defendants from the statement of facts in this opinion.

obtained the drugs from a distributor/exporter named Serra Morena in Brazil, and later from a counterfeit lab in Costa Rica. Cruz's scheme worked by shipping drugs to a third country, at which point the pharmaceuticals were extracted by a Miami Customs contact so they could be illegally diverted into the United States. Cruz then shipped the pharmaceuticals to a repacking facility, where the pills were placed into "U.S. approved" prescription bottles and distributed from Cruz's company, Pharma Medical, to Albers or H.D. Smith. By "fill[ing] in the paper trail loop," Carlow was the intermediary to Albers.

Cruz's operation formed the basis for the indictment's predicates 15 through 34. On cross-examination, Cruz not only testified that he did not know de la Osa or Godinez, but further stated that they were not involved in *any* of the predicate offenses linked to him. For each of these predicate offenses, defense counsel engaged in dialogue similar to the following:

> [Defense Counsel]: The first predicate was June the 27th of 2002. That was a wire transfer from G & K to your bank account Pharma Medical.
>
> . . .
>
> Joel de la Osa had nothing to do with that transaction, correct?
>
> [Cruz]: Correct.
>
> [Defense Counsel]: And let's talk about predicate 16. This was a wire transfer that you said happened on July the 2nd of 2002 from Pharma Medical to GD Medical at Ocean Bank. Joel de la Osa had nothing to do with that transaction, correct?
>
> [Cruz]: Correct.

### Judgment and Sentence

The jury found de la Osa guilty of racketeering, conspiracy to commit racketeering, and organized scheme to defraud, while acquitting him of possession of legend drugs with intent to sell. From this conviction, the court adjudicated de la Osa guilty and sentenced him on each count to 192 months in prison, followed by two years of community control, followed by ten years of probation, with all sentences to run concurrently.

## The Statutory Provisions at Issue

Section 895.03(3), Florida Statutes (2003), the substantive RICO charge in Count I, provides:

> (3) It is unlawful for any person employed by, or associated with, any enterprise to conduct or participate, directly or indirectly, in such enterprise through a pattern of racketeering activity or the collection of an unlawful debt.

Section 895.02, Florida Statutes (2003), defines the terms contained in section 895.03(3) and (4):

> • "Racketeering activity" means "to commit, to attempt to commit, to conspire to commit, or to solicit, coerce, or intimidate another person to commit" any crime chargeable by indictment or information under specifically enumerated criminal statutes.[5]  § 895.02(1), Fla. Stat. (2003).

> • An "enterprise" is defined, in relevant part, as "any . . . group of individuals associated in fact although not a legal entity." § 895.02(3), Fla. Stat. (2003).

> • A "pattern of racketeering activity" is defined as "engaging in at least two incidents of racketeering conduct that have the same or similar intents, results, accomplices, victims, or methods of commission or that otherwise are interrelated by distinguishing characteristics and are not isolated incidents, provided at least one of such incidents occurred after the effective date of this act and that the last of such incidents occurred within 5 years after a prior incident of racketeering conduct."  § 895.02(4), Fla. Stat. (2003).

The statute implicated in the conspiracy to commit RICO charge of Count II provides:

> (4) It is unlawful for any person to conspire or endeavor to violate any of the provisions of . . . subsection (3).

---

[5]As predicate acts for the RICO charge, Count I alleged two state crimes under Chapter 812, Florida Statutes, grand theft and dealing in stolen property, and thirty-four federal crimes, mail fraud and wire fraud, chargeable under 18 U.S.C. § 1341 and 18 U.S.C. § 1343.  *See* § 895.02(1)(a)32, (b), Fla. Stat. (2003).

§ 895.03(4), Fla. Stat. (2003).

The organized scheme to defraud charge in Count III involves section 817.034(4)(a)1., Florida Statutes (2003), which provides that "[a]ny person who engages in a scheme to defraud and obtains property thereby is guilty of organized fraud," punishable as a first degree felony if the amount of property obtained has "an aggregate value of $50,000 or more."  The statute defines certain terms:

> •"Scheme to defraud" is defined as "a systematic, ongoing course of conduct with intent to defraud one or more persons, or with intent to obtain property from one or more persons by false or fraudulent pretenses, representations, or promises or willful misrepresentations of a future act."  § 817.034(3)(d), Fla. Stat. (2003).

> •"Property" means "anything of value. . . . "  § 817.043(3)(c), Fla. Stat. (2003).

"The Florida RICO statute was largely modeled after the Federal RICO statute."  *Gross v. State*, 765 So. 2d 39, 42 (Fla. 2000).  Therefore, "Florida courts look to federal courts for guidance in construing RICO provisions." *Mese v. State*, 824 So. 2d 908, 912 (Fla. 3d DCA 2002); *Gross*, 765 So. 2d at 42.

### Although the State established that de la Osa was associated with an "enterprise" under the RICO statute, it failed to prove that he committed two incidents of racketeering conduct

De la Osa attacks the RICO conviction on two grounds.  First, he contends that the type of conspiracy established in this case is of the type described in *Kotteakos v. United States*, 328 U.S. 750 (1946), and that such a conspiracy does not amount to an "enterprise" within the meaning of section 895.02(3).  Second, he argues that the State failed to prove that he committed the two predicate acts necessary to establish a "pattern of racketeering activity" under section 895.02(4).  Although a *Kotteakos* "hub-and-spoke" conspiracy is subsumed by the RICO statute, application of *Kotteakos* principles for determining vicarious criminal liability leads to the conclusion that the State failed to prove that de la Osa committed the two predicate acts necessary to establish a "pattern of racketeering activity" under the RICO statute.

- 11 -

For RICO purposes, an "enterprise" consists of "(1) an ongoing organization, formal or informal, with a common purpose of engaging in a course of conduct, which (2) functions as a continuing unit." *Helmadollar v. State*, 811 So. 2d 819, 820 (Fla. 5th DCA 2002) (citation and quotation marks omitted). The contours of an "enterprise" are intended to be broadly construed. *See United States v. Rogers*, 89 F.3d 1326, 1337 (7th Cir. 1996). As the United States Supreme Court has explained:

> [A]n association-in-fact enterprise is simply a continuing unit that functions with a common purpose. Such a group need not have a hierarchical structure or a "chain of command"; decisions may be made on an ad hoc basis and by any number of methods—by majority vote, consensus, a show of strength, etc. Members of the group need not have fixed roles; different members may perform different roles at different times. The group need not have a name, regular meetings, dues, established rules and regulations, disciplinary procedures, or induction or initiation ceremonies. While the group must function as a continuing unit and remain in existence long enough to pursue a course of conduct, nothing in RICO exempts an enterprise whose associates engage in spurts of activity punctuated by periods of quiescence.

*Boyle v. United States*, 556 U.S. 938, 948 (2009).

A conspiracy is different than the broad contours of a RICO enterprise. To determine whether a single, unified conspiracy exists, courts consider "(1) whether a common goal existed; (2) the nature of the underlying scheme; and (3) the overlap of participants." *United States v. Edouard*, 485 F.3d 1324, 1347 (11th Cir. 2007) (quotation marks and citation omitted). Where the conspiracy consists of sub-agreements among differing members, the "'key is to determine whether the different sub-groups are acting in furtherance of one overarching plan.'" *United States v. Calderon*, 127 F.3d 1314, 1329 (11th Cir. 1997) (quoting *United States v. Ghazaleh*, 58 F.3d 240, 245 (6th Cir. 1995)).

In this case, de la Osa asserts the State presented evidence of a rimless "hub-and-spoke" conspiracy in which he was involved only with Carlow. A "hub-and-spoke" conspiracy arises where "a central core of conspirators recruits separate groups of co-conspirators to carry out the various functions of the illegal enterprise." *United States v. Chandler*, 388 F.3d 796, 807 (11th Cir. 2004). The analogy used is one of a wagon wheel: the core members of the conspiracy are called the "hub," the other members are called the "spokes," and connections between the spoke members are

considered the wheel's "rim." *See United States v. Seher*, 562 F.3d 1344, 1367-68 (11th Cir. 2009). In a unified conspiracy, the "spokes" are aware of the other members' roles, the conspiracy proceeds towards a common goal, and the members are connected to each other. *See Chandler*, 388 F.3d at 808. By contrast, "where the 'spokes' of a conspiracy have no knowledge of or connection with" the other "spokes" and "deal[] independently with the hub conspirator, there is not a single conspiracy, but rather as many conspiracies as there are spokes." *Id.* at 807 (citing *Kotteakos*, 328 U.S. at 754-55). Therefore, for a "rimmed" wheel conspiracy to exist, "the various spokes must be aware of each other and their common aim to form a single conspiracy," *United States v. Pacchioli*, 718 F.3d 1294, 1303 (11th Cir. 2013), *cert. denied*, 134 S. Ct. 804 (2013), exhibited by an "interdependence amongst the co-conspirators." *Seher*, 562 F.3d at 1366; *see also United States v. Portela*, 167 F.3d 687, 695 (1st Cir. 1999) ("[E]vidence of an individual participant's understanding of the interdependence of the co-conspirators' activities is evidence—often the best evidence—of tacit agreement between the individual and his co-conspirators.").

In the narcotics sales context, "a simple buyer-seller relationship, without any prior or contemporaneous understanding beyond the sales agreement itself, is insufficient to establish that the buyer was a member of the seller's conspiracy." *United States v. Gibbs*, 190 F.3d 188, 197 (3d Cir. 1999). However, "a conspiracy may be found when the seller understood that the buyer intended to resell the drugs to others." *United States v. Roe*, 210 F.3d 741, 747 (7th Cir. 2000); *see also United States v. Maseratti*, 1 F.3d 330, 336 (5th Cir. 1993) ("One becomes a member of a drug conspiracy if he *knowingly participates* in a plan to distribute drugs, whether by buying, selling or otherwise." (emphasis added)). From that point, the conspiracy extends only so far as the co-conspirators' agreement and mutual dependence. *See United States v. Maldonado-Rivera*, 922 F.2d 934, 963 (2d Cir. 1990); *United States v. Tercero*, 580 F.2d 312, 316 n.15 (8th Cir. 1978); *United States v. Harrison*, 942 F.2d 751, 756 (10th Cir. 1991). As one court has explained:

> [W]hen dealer A sells drugs to dealer B, we don't presume that A has agreed to work for the benefit of everyone else with whom B deals, or that A benefits from B's other deals. If A knows of, and benefits from, B's subsequent distribution, we may infer a limited agreement to distribute between A and B. *See, e.g., United States v. Roth*, 777 F.2d 1200, 1205 (7th Cir. 1985) ("while the ultimate consumer is not himself a conspirator . . . the middleman is"). But agreement to join *other* endeavors and distributors "cannot be drawn merely

from knowledge the buyer will use the goods illegally." *Direct Sales Co. v. United States*, 319 U.S. 703, 709 (1943) (interpreting *United States v. Falcone*, 311 U.S. 205 (1940)). The scope of a conspiracy is determined by the scope of the agreement, *United States v. Sababu*, 891 F.2d 1308, 1322 (7th Cir. 1989), and if the jury is to infer an agreement to join a conspiracy that transcends the scope of a more limited conspiracy, there must be some additional evidence to justify taking the inference further:

> A seller of narcotics in bulk surely knows that the purchasers will undertake to resell the goods over an uncertain period of time, and the circumstances may also warrant the inference that a supplier or a purchaser indicated a willingness to repeat. But a sale or a purchase scarcely constitutes a sufficient basis for inferring agreement to cooperate with the opposite parties *for whatever period they continue to deal in this type of contraband, unless some such understanding is evidenced by other conduct which accompanies or supplements the transaction.*

[*United States v.*] *Borelli*, 336 F.2d [376, 384 (2d. Cir. 1964)].

*United States v. Townsend*, 924 F.2d 1385, 1392 (7th Cir. 1991).

In *Townsend*, the government alleged that by dealing with a large-scale drug dealer, numerous narcotics suppliers conspired not only with the drug dealer but also with each other supplier who dealt with him. 924 F.2d at 1388, 1390. The trial evidence showed that one of the defendants, Luis Diaz, frequently provided the dealer with narcotics but "had no interest in [the dealer's] activities . . . beyond occasionally obtaining drugs for" him. *Id.* at 1397. Further, Diaz knew the dealer "had extensive drug dealings beyond those in which he was involved," but he never "was in league with [the dealer's] other suppliers." *Id.* Upon these facts, the federal Seventh Circuit held Diaz conspired with the drug dealer, but not with the dealer's suppliers, explaining: "[Diaz] knew that [the dealer] had extensive drug dealings beyond those in which he was involved . . . , but that knowledge alone did not make him a coconspirator with those involved in [the dealer's] other deals." *Id.* Likewise, the court found Diaz's supplier, Claudio, not to have conspired with the suppliers since "the government presented no evidence indicating that he had any stake in the subsequent distribution of [Diaz's] drugs." *Id.* at 1398.

*The RICO "enterprises" v. the conspiracy*

One impetus for the passage of the Federal RICO act was to overcome the tortuous conceptual difficulties of conspiracy law by establishing a broad, all-encompassing definition of a criminal "enterprise" under RICO, a definition which includes wheel and spoke conspiracies under its umbrella. As the court observed in the seminal case of *United States v. Elliott,*

> Congress intended to authorize the single prosecution of a multi-faceted, diversified conspiracy by replacing the inadequate "wheel" and "chain" rationales with a new statutory concept: the enterprise.

571 F.2d 880, 902 (5th Cir. 1978). Conspiracy law focuses on a "common objective" or the scope of the agreement between co-conspirators. In contrast, RICO created a substantive offense which tied together diverse parties and crimes, with the gravamen of the charge being that the actors participated, directly or indirectly, in the affairs of the enterprise by committing two or more predicate crimes. *Id.* The type of conspiracy in this case fell under RICO's broad definition of an "enterprise."

To say that there was a RICO "enterprise" does not end the inquiry. To prove a substantive racketeering charge under section 895.03(3), the State must prove the defendant's "(1) conduct or participation in an enterprise[] through (2) a pattern of racketeering activity." *Doorbal v. State*, 983 So. 2d 464, 492 (Fla. 2008). "Racketeering activity" is "defined to include certain specified crimes under state law and under the federal RICO Act," among which are wire and mail fraud. *Carlson v. State*, 405 So. 2d 173, 174 (Fla. 1981); § 895.02(1)(b), Fla. Stat. (2003); 18 U.S.C. § 1961(1). These specified crimes are typically called predicate acts. Thus, the State must establish a "pattern of racketeering activity" by presenting evidence that the defendant engaged in at least two predicate acts that have the same or similar intents, results, accomplices, victims, or methods of commission. *See Morgan v. State*, 117 So. 3d 79, 81-82 (Fla. 2d DCA 2013); *Sanchez v. State*, 89 So. 3d 912, 914 (Fla. 2d DCA 2012).

The State argues that it satisfied the two predicate act requirement by showing de la Osa's participation in the overall scheme to defraud, which it characterizes as a "single unified enterprise or conspiracy," so that de la Osa became "vicariously liable for the use of the mail and wires by other members of the scheme."

Conspiracy can be "a basis for imposing vicarious liability or responsibility on a defendant for a criminal act," even where the defendant did not directly participate in its commission. *Boyd v. State*, 389 So. 2d 642, 648 (Fla. 2d DCA 1980). Because the definition of "racketeering activity" in section 892.02(1) includes "conspir[ing] to commit" enumerated crimes, the State can establish a substantive RICO charge under section 895.03(3) "by proving that defendants conspired to commit predicate acts of racketeering activity." *State v. Reyan*, 145 So. 3d 133, 139 (Fla. 3d DCA 2014). In this case, it is necessary to delve into conspiracy law to decide whether the State proved the requisite predicate acts for the substantive RICO charge.

De la Osa is correct that the State's evidence showed he was involved in a rimless hub and spoke conspiracy. Although de la Osa and his immediate cohorts—Garcia, Ozete, and Tabares[6]—supplied Carlow with adulterated prescription drugs, there was no proof of interdependence between de la Osa and Carlow's other drug suppliers. Indeed, de la Osa competed with Godinez and Julio Cruz in the same market; their loss was de la Osa's gain. The evidence showed that de la Osa's group sold drugs to Carlow in exchange for money and helped create phony pedigrees, at which point their involvement with the conspiracy ended. Under such circumstances, de la Osa's conspiracy cannot be linked with Carlow's other suppliers, as they were each working towards separate goals.

Absent in this case is the type of connection between the "spoke" conspirators—de la Osa, Godinez, and Cruz—from which the jury could properly conclude that de la Osa "knew of the 'existence and scope' of the larger conspiracy" of which Carlow was the hub. *United States v. Franco-Santiago*, 681 F.3d 1, 11 (1st Cir. 2012). There was no interaction between conspirators on the different spokes of the Carlow wheel, no indication of a connection between them, no suggestion that de la Osa knew that his own ability to profit from the scheme depended on the success of the other conspirators as well. *See Seher*, 562 F.3d at 1367-68; *United States v. Niemi*, 579 F.3d 123, 127 (1st Cir. 2009); *United States v. Huff*, 609 F.3d 1240, 1244 (11th Cir. 2010); *United States v. Moore*, 525 F.3d 1033, 1044 (11th Cir. 2008). Without such a connection to the conspirators on other spokes, de la Osa cannot be held vicariously liable for crimes committed by those conspirators.

---

[6]The de la Osa "spoke" conspiracy involved more than just these three. De la Osa's "spoke" includes, for example, himself, Tabares, Henry Garcia, Carlos Ozete, Ragelio Ramos, Michael Carlow, and Noah Salcedo.

The distinction between a single conspiracy and a rimless "hub-and-spoke" conspiracy is relevant in the context of a variance between the charging document and the proof presented at trial. *See United States v. Buckley*, 525 F.3d 629, 634 n.2 (8th Cir. 2008). "A defendant asserting a claim of variance will succeed in obtaining reversal of his conviction only if he establishes that (1) the evidence presented at trial was insufficient to support the jury's finding of a single conspiracy, and (2) he was prejudiced by the variance." *United States v. Curtis*, 37 F.3d 301, 305 (7th Cir. 1994).

Here, de la Osa's asserted prejudice is that, unless he can be brought under the umbrella of an overall Carlow conspiracy, the State's evidence demonstrated his involvement in just one predicate act—Predicate 11—the Pak Mail incident. During the judgment of acquittal phase, the State more or less conceded de la Osa's non-involvement in the remaining predicate offenses, engaging the trial court in the following dialogue:

> [The State]: Judge, the proof of your involvement in the predicate acts as to the Mail and Wire Fraud is the fact that they were part and parcel of the scheme to defraud. The scheme to defraud that is laid out in the Mail and Wire Fraud predicates themselves.
>
> And the Federal case law is very clear that if you are a part of a mail fraud or of a wire fraud, then any mailings done by any person, that was reasonably foreseeable, you have vicarious responsibility for it. So they are involved in each and every one of the Mail and Wire Fraud predicates by virtue of the fact that they are, in fact, involved in the scheme to defraud. So it's vicarious liability.
>
> THE COURT: You would agree when [Godinez's counsel] said you have no direct evidence with respect to Mr. Godinez that he was involved directly in any of the predicate acts, other than the scheme to defraud?
>
> [The State]: That's as to both Defendants. Only their participation in the scheme to defraud.
>
> THE COURT: Mr. de la Osa, I think it's alleged, . . . it's more direct, at least two of them, involve the Pak Mail as well as the wire transfer, I guess, for which he was out of the country during that time, right?

[The State]: I don't know that that wire transfer is actually a predicate incident.

[Defense]: It's not, Your Honor. Essentially, the only predicate in the RICO counts –

THE COURT: Is the Pak Mail.

. . .

[The State]: So as to the other counts, as to [the ]other predicates as to Mr. de la Osa, as to all the predicates as to Mr. Godinez, it all rides on their participation in the . . . underlying scheme to defraud as detailed in the Mail and Wire Fraud.

So there is no evidence that they [de la Osa and Godinez] physically mailed any of these packages but, of course, that's not necessary.

The question, therefore, is whether any of the remaining predicate acts are attributable to the de la Osa spoke of his conspiracy with Carlow.

Analyzing the indictment, predicates 2, 3, 5, and 14 involve activities completed well before de la Osa headed Complete, negating his possible involvement. To the same effect, predicates 15 through 34 entail actions taken by Julio Cruz's business, Pharma Medical, which, as Cruz stated on cross examination, had no bearing on de la Osa's "spoke." Thus, the substantive RICO charge depends on evaluating the remaining alleged predicate acts.

*Predicates 4, 6, 7, 8, 9, 10 and 13*

The majority of the remaining alleged predicate acts involved the actions of David Ebanks, a primary cohort of Fabian Diaz. Ebanks's involvement arose in late 2000 when Henry Garcia and Diaz recruited him to not only head RGD but also to ship pharmaceutical packages—primarily to Albers. From 2001 through 2003, Ebanks, at the behest of Diaz and Garcia, opened numerous additional pharmaceutical corporations under his name, including: Avanti, Four Points, JB Pharmaceuticals, and Phoenix Wholesale. During the same span, Diaz and Garcia procured for Ebanks a fake driver's license under the name "Julius Taylor," which he used to make shipments from various locales around South Florida.

The indictment's predicate 4 alleged that on or about June 21, 2002, the members of Carlow's conspiracy[7] caused a letter to be mailed from Ebanks to Lori Berrera in Corpus Christi, Texas. Similarly, predicate 13 alleged the enterprise directed that a letter be sent from Ebanks to Chavey Real Estate in the same region. At trial, Ebanks testified that both letters contained money orders to secure office space for his pharmaceutical company, Four Points. Most notably, on cross examination, Ebanks testified that de la Osa had "nothing to do with" either transaction. Without linking de la Osa to Four Points's operation, these predicate acts do not suffice as predicate acts he committed.

Predicates 6, 7, 8, 9, and 10 pertained to Ebanks's various shipments of pharmaceutical products from South Florida in September through December, 2002. For each predicate, Ebanks testified that the delivery was directed by Fabian Diaz, with whom de la Osa was never affiliated. Likewise, on cross examination, Ebanks confirmed yet again de la Osa's non-involvement in each offense. So too, Agent Venema, the lead detective for the case, testified that there was no evidence of de la Osa being "directly or indirectly" involved in any of the abovementioned predicates. Without evidence linking these events to de la Osa or, at the very least, to drugs deriving from Complete or Pormis, the subject predicate acts could not form the basis for de la Osa's racketeering conviction.

*Predicate 12*

The indictment's only remaining predicate act—Predicate 12—alleges the following:

> - Predicate 12 (Mail Fraud: dated February 14, 2003): "cause to be delivered by private or commercial interstate carrier, to wit: United Parcel Service (UPS), according to the direction thereon a certain package from Albers Medical, Kansas City, Missouri, to Medcom Pharmaceutical Wholesale Drugs, Jensen Beach, Florida, contrary to 18 U.S.C. § 1341."

Medcom Pharmaceuticals was a corporation owned by Joe DeMone that was raided by law enforcement on April 11, 2013, resulting in the recovery of about $455,000 worth of Celebrex and Lipitor. The invoice and

---

[7]Specifically, the indictment lists: Michael Carlow, Candace Carlow, Thomas Atkins, Jr., Marilyn Atkins, Henry Garcia, Fabian Diaz, Joel de la Osa, David Ebanks, a/k/a Julius Taylor, Jose L. Benitez, Dariel Tabares, Michael E. Burman, Lazaro Vilarchao, Ivan Vilarchao, Joseph Villanueva, Arturo Godinez, Tom Martino, and Julio Cesar Cruz, a/k/a Ricardo Garcia.

pedigrees for the drugs originated from Carlow—specifically, G&K Pharma—linking it to the conspiracy. There was no evidence tying this predicate act to de la Osa, Complete, or Pormis.

Under a narrower conspiracy theory than that urged by the State, the trial evidence demonstrated de la Osa and his group's involvement in just one predicate act—Predicate 11. Since the State's evidence failed to prove de la Osa's involvement in two or more predicate acts, the trial court should have granted a motion for judgment of acquittal as to count I for racketeering.

### *There was proof of fraudulent conduct sufficient to support the conviction for organized scheme to defraud and to form the predicate acts of wire and mail fraud on the RICO counts*

De la Osa raises two arguments directed at mail and wire fraud, which formed the basis for the racketeering count's predicate acts, and at the conviction for organized scheme to defraud. At trial, de la Osa argued that to sustain a conviction for mail or wire fraud, the State was required to demonstrate misrepresentation or deception on his part designed to deprive the victim—in this case consumers—"of some financial or property interests." To that end, de la Osa contended that although his co-conspirators created phony pedigrees and invoices, there was no evidence proving he introduced drugs into the market that were not "pure, genuine and unadulterated." Without such defects, de la Osa asserted he had no duty to disclose to consumers the channel of distribution for the prescription drugs, since consumers are "entitled to know" only that the item purchased "is genuine, that it's pure and that it's unadulterated." In so arguing, de la Osa contrasted his situation with Cruz, who placed counterfeit drugs on the market, not only depriving the consumers the benefit of their bargain but also placing their health at risk. Under de la Osa's theory, if the alleged predicate acts are not crimes, then the RICO conspiracy and scheme to defraud convictions must fall.

In response, the State asserts that pharmaceutical consumers are "entitled to all material facts," particularly when their decision involves potentially life-saving HIV and cancer medication. In the State's view, consumers facing serious diseases were entitled to rely on the fact that prescription drugs went through prescribed distribution channels, rather than being stored in a nursery or the house of a convicted felon. Thus, the State's position did not turn on the genuineness of the drugs; rather, the disclosure of the drugs' accurate distribution channel was a material fact that could neither be falsified nor omitted. De la Osa contends that he had no duty to disclose licensing violations to consumers and that there

could be no misrepresentation because "pedigree papers are not provided to the ultimate consumer."

*Analysis*

In this case, the bulk of the predicate acts for the racketeering count were mail and wire fraud, two federal crimes defined by federal statutes. *See* § 895.02(1)(b), Fla. Stat. (2003). To obtain a conviction for wire or mail fraud, the government must prove the defendant: "(i) participated in a scheme to defraud; (ii) acted with intent to defraud; and (iii) used the mail or wires in furtherance of the fraudulent scheme." *United States v. Vincent*, 416 F.3d 593, 600 (7th Cir. 2005) (citation omitted); *see also Neder v. United States*, 527 U.S. 1, 24-25 (1999). Mail and wire fraud are identical, apart from the use of wires or mail. *See United States v. Frey*, 42 F.3d 795, 797 (3d Cir. 1994); *United States v. Briscoe*, 65 F.3d 576, 583 (7th Cir. 1995).

In demonstrating the defendant "participated in a scheme to defraud" under the federal statutes, the State must show (1) the existence of a scheme to defraud, (2) the requisite scienter (or fraudulent intent) on the part of the defendant, and (3) the materiality of the representations. *See United States v. Pierce*, 224 F.3d 158, 165 (2d Cir. 2000). While the mail and wire fraud statutes do not define "scheme to defraud," it "has been described as a plan to deprive a person of something of value by trick, deceit, chicane, or overreaching. It is characterized by a departure from community standards of fair play and candid dealings." *United States v. Autuori*, 212 F.3d 105, 115 (2d Cir. 2000) (citations and quotation marks omitted); *see also United States v. Steffen*, 687 F.3d 1104, 1113 (8th Cir. 2012) ("[W]e have previously characterized a scheme to defraud as a departure from fundamental honesty, moral uprightness, or fair play and candid dealings in the general life of the community." (internal quotation omitted)); *United States v. Bishop*, 825 F.2d 1278, 1280 (8th Cir. 1987) ("[T]he crime of mail fraud is broad in scope. . . . The fraudulent aspect of the scheme to defraud is measured by a nontechnical standard. . . . Law puts its imprimatur on the accepted moral standards and condemns conduct which fails to match the reflection of moral uprightness, of fundamental honesty, fair play and right dealing in the general and business life of the members of society. This is indeed broad." (citation and quotation marks omitted)). Because the application of such a broad definition presents the possibility of "'abuse . . . to punish criminally any departure from the highest ethical standards,'" courts must apply the wire or mail fraud statutes with care. *Batten v. State*, 591 So. 2d 960, 964 (Fla. 2d DCA 1991) (quoting *United States v. Dial*, 757 F.2d 163, 170 (7th Cir. 1985)).

Fraud sufficient to sustain a conviction for mail or wire fraud may be met by affirmative representations or "active concealment," which is "characterized by deceptive acts or contrivances intended to hide information, mislead, avoid suspicion, or prevent further inquiry into a material matter." *Steffen,* 687 F.3d at 1114; *see also Langford v. Rite Aid of Ala., Inc.,* 231 F.3d 1308, 1312 (11th Cir. 2000) ("Intent to defraud need not be shown through active misrepresentation–material omissions can be fraudulent if they are intended to create a false impression." (citations omitted)). In this context, "active concealment" encompasses

> either a representation good as far as it goes, but accompanied with such a suppression of facts as makes it convey a misleading impression, [o]r an attempt by one party to draw the other's attention from a fact or to cover it from view. In the first case, the nondisclosure has the effect of either impliedly representing that the fact concealed does not exist or of rendering the facts disclosed absolutely false; in the second case, the conduct of the party outside of an actual representation, is a fraud on the other . . . .

*Haberman v. Greenspan,* 368 N.Y.S.2d 717, 720 (N.Y. Sup. Ct. 1975) (internal quotation omitted). The resulting principle is that "[a]lthough silence as to a material fact (nondisclosure), without an independent disclosure duty, usually does not give rise to an action for fraud, suppression of the truth with the intent to deceive (concealment) does." *Steffen,* 687 F.3d at 1114 (quoting *United States v. Colton,* 231 F.3d 890, 898-99 (4th Cir. 2000)).

The broad construction accorded to mail and wire fraud is equally applicable to the state crime of organized scheme to defraud under section 817.034. The express legislative intent behind that section is to combat schemes to defraud and to permit prosecution by "utilizing the legal precedent available under federal mail and wire fraud statutes." § 817.034(1)(b), Fla. Stat. (2003). The term "scheme to defraud" used in section 817.034 is plucked from federal mail and wire fraud cases.

Here, the State's theory of the case demonstrated that the criminal enterprise sold illegally obtained prescription drugs with the intent to defraud consumers by, in some instances, fabricating paperwork to give the appearance that the drugs were legitimately distributed. These facts constitute a "scheme to defraud" because the conspiracy intended to deprive consumers of money in exchange for illegally obtained prescription drugs, and the conspiracy not only omitted this material information but

took active steps to disguise the true provenance of the drugs. *See Autuori*, 212 F.3d at 115. The misrepresentations and omissions were "material" because illegally obtained drugs would presumably be unmarketable or worth far less than drugs traveling from the manufacturer to the consumer through legitimate channels; therefore, the consumers who purchased these drugs were paying too much. In that regard, de la Osa was engaged in the scheme to defraud because he must have known that selling illegally obtained drugs to a drug wholesale business would eventually result in the sale of the drugs to consumers. *Cf. Ward v. Atlantic Sec. Bank*, 777 So. 2d 1144, 1146 (Fla. 3d DCA 2001).

*Chapter 499 Violations*

De la Osa further argues the State could not "bootstrap" Chapter 499 violations as RICO predicate acts by reassigning the violations as mail or wire fraud since the Legislature's addition of Chapter 499 violations as RICO predicate acts in 2003 demonstrates the Legislature's intention that such violations not serve as RICO predicate acts prior to the amendment. It is true the State could not have charged the defendants with Chapter 499 violations as RICO predicate acts since the Florida RICO statutes did not include Chapter 499 violations as predicate acts until after the criminal activity in this case occurred. *Cf. Flores v. Emerich & Fike*, No. 1:05-CV-0291 AWI DLB, 2008 WL 2489900, at *33 (E.D. Cal. June 18, 2008) (dismissing civil RICO claim when plaintiff alleged violations of Federal Food, Drug, and Cosmetic Act as predicate offenses when federal RICO statute did not list such violations as predicate offenses). However, that is not what occurred in this case.

Federal courts have held that mail fraud may be used as a "'stopgap' device which would permit the prosecution of newly-conceived frauds until such time that Congress enacted particularized legislation to cope with the new frauds." *United States v. McNeive*, 536 F.2d 1245, 1248 n.5 (8th Cir. 1976) (citing *United States v. Maze*, 414 U.S. 395, 405-06 (1974) (Burger, C.J., dissenting)). Here, the fact that the Legislature later chose to include Chapter 499 violations as RICO predicate acts does not preclude prosecutors from using mail and wire fraud as a "stopgap device" for acts occurring before the legislation took effect. In other words, if the same conduct constitutes a Chapter 499 violation and mail or wire fraud, the State may pursue RICO charges with mail or wire fraud as the predicate offenses.

***There was adequate evidence to support the RICO conspiracy charge***

Although the failure to establish two predicate acts is fatal to the racketeering count, it does not mandate reversal of the conspiracy to commit racketeering conviction. The gravamen of a RICO conspiracy "is premised not upon the commission of the predicate acts of racketeering, or even an agreement to commit predicate acts, but upon an *agreement to participate in the affairs of the criminal enterprise* through a pattern of racketeering activity." *Reyan*, 145 So. 3d at 139; *see also Mese*, 824 So. 2d at 913; *Salinas v. United States*, 522 U.S. 52, 63-66 (1997). A defendant's agreement may be inferred from his conduct. *United States v. Hughes*, 895 F.2d 1135, 1141 (6th Cir. 1990). To prove conspiracy under section 817.034(4)(a)1., the State may show that the defendant knew the overall objectives of the enterprise and intended to participate in it or agreed to further its purpose. *See Morgan,* 117 So. 3d at 82; *United States v. Volpendesto*, 746 F.3d 273, 284 (7th Cir. 2014). "[T]he RICO conspiracy statute proscribes a defendant's agreement to participate in the conduct of the affairs of an enterprise, not a defendant's agreement to commit predicate acts." *Reyan*, 145 So. 3d at 140 n.7. The State does not have to prove that a conspirator agreed to commit the predicate crimes himself, only that "a particular defendant agreed that a member of the conspiracy would commit two predicate racketeering acts." *United States v. Benabe*, 654 F.3d 753, 776 (7th Cir. 2011). Thus, to convict a defendant of RICO conspiracy, the jury need not be unanimous as to the specific predicate acts that the defendant agreed someone would commit. *United States v. Randall*, 661 F.3d 1291, 1299 (10th Cir. 2011); *United States v. Applins*, 637 F.3d 59, 81–82 (2d Cir. 2011). Rather, the jury need only be unanimous "as to the types of predicate racketeering acts" that someone would commit to further the criminal enterprise. *Randall*, 661 F.3d at 1299.

There was ample evidence that de la Osa was aware of the nature and scope of the criminal enterprise and conspired with others to perform the types of criminal acts that would advance its purpose. His company, Complete, worked hand in hand with G&K Pharma to ship product across state lines. His introduction of his brother-in-law to Carlow demonstrated his understanding of the scope and nature of the enterprise. His attempt to bypass Carlow's involvement demonstrated his intent to run his own enterprise and his awareness of what had to be done to make the enterprise successful. There was evidence from which the jury could conclude that de la Osa intended that mail and wire fraud would be committed during the course of the enterprise to further its goals.

We have considered the other issues raised on appeal and conclude that there was no error. We note that with regard to the trial court's failure to hold a hearing pursuant to *Richardson v. State*, 246 So. 2d 771 (Fla.

1971), we find no procedural prejudice as a result of the challenged testimony.

We reverse the RICO conviction and affirm the convictions for conspiracy to commit RICO and organized scheme to defraud.

WARNER and CIKLIN, JJ., concur.

\* \* \*

***Not final until disposition of timely filed motion for rehearing.***